## CHAFIN WILL CASE.

(1) *Effect of verdict of jury in case of a contested will.* (2, 3) *Indicia of mental unsoundness inconsistent with testamentary capacity.*

1. Where the circuit court, on appeal from the decision of the county court respecting the admission of a will to probate, submits a question of fact to a jury, the verdict has substantially the effect of a verdict on

a feigned issue in chancery, and if it is clearly contrary to the weight of evidence, the refusal of a new trial is error. *Jackman Will Case,* 26 Wis., 104.

2. The characteristics or *indicia* of insanity, or of that mental unsoundness which is inconsistent with testamentary capacity, stated and considered per LYON, J.

3. Giving to the evidence for the contestants of the will in this case its fullest effect, this court is of opinion that the mental peculiarities and eccentricities of character and conduct of the testator thus shown (for a full account of which see the opinion) were not sufficient evidence of testamentary incapacity, and that the circuit court erred in refusing a new trial, and in adjudging the will invalid, after a verdict that the testator was not of sound mind.

APPEAL from the Circuit Court for *Green* County.

On the 15th day of December, 1870, Ephraim Bradley Chafin executed an instrument in writing purporting to be his last will and testament, and on the 18th of the same month he died. It is understood that by such instrument he attempted to give his personal property to his wife Nancy Chafin, together with the use of his real estate during her life. The instrument contains the following clause: "I further will that ten years after the death of Nancy Chafin, the proceeds of my real estate be given to the American Bible Society forever." To each of his children, four in number, he left a legacy of one dollar. After the death of Chafin the instrument was duly presented to the county court of the proper county for probate, and after a hearing that court refused to admit it to probate for reasons stated in its findings and judgment. The executor and legatees named therein thereupon took an appeal to the circuit court. On the trial in the latter court the following questions were submitted to the jury:

1. Did Ephraim B. Chafin in his lifetime execute the paper writing propounded as his last will and testament, bearing date December 15, 1870? And did the witnesses whose names are thereunto subscribed attest and subscribe the same in the presence of said Ephraim B. Chafin?

2. Was the said paper writing so executed by the said Ephraim B. Chafin with full knowledge of its provisions?

3. Was the said Ephraim B. Chafin of sound mind when he executed the said paper writing dated December 15, 1870?

4. Was said Ephraim B. Chafin induced to execute the said paper writing by any influence which deprived him of his free will?

The jury returned to the *first* and *second* of these questions an affirmative answer, and to the *third* and *fourth* a negative answer. That is, they found for the proponents on the *first*, *second* and *fourth* questions, and for the contestants on the question of testamentary capacity.

The circuit court refused to disturb the verdict or findings of the jury, and gave judgment affirming the judgment or order of the county court refusing to admit the alleged will to probate. The proponents appealed from the judgment of the circuit court.

The testimony given on the trial in the circuit court is sufficiently stated in the opinion.

*Cassoday & Merrill*, for appellant, cited 1 Redfield on Wills, note 9 on p. 79, subds. 14, 15, 18, 21, 23, on pp. 82, 89, subd. 7 on p. 124, and subd. 9 on p. 125; *Thompson v. Quimby*, 2 Bradf., 449; *S. C.*, 21 Barb., 107; *Addington v. Wilson*, 5 Ind., 137; *Van Guysling v. Van Kuren*, 35 N. Y., 70; *Clapp v. Fullerton*, 34 id., 190.

*H. Medberry* (with *Vilas & Bryant*, of counsel), for respondents, cited *Dew v. Clark*, 3 Addams, 79; *Lucas v. Parsons*, 24 Ga., 640; *Johnson v. Moore's Heirs*, 1 Litt. (Ky.), 371; *Florey v. Florey*, 24 Ala., 241; *Jencks v. Smithfield*, 2 R. I., 255; *Stanton v. Weatherwax*, 16 Barb., 259; *A. S. F. Society v. Hopper* 43 id., 625; *S. C.*, 33 N. Y., 619; *Brooke v. Townshend*, 7 Gill,, 10; *White v. Wilson*, 13 Ves., 88; *Jackman Will Case*, 26 Wis., 104; Taylor's Med. Jur. (6th ed.), 629, 656; Ray's Med. Jur. of Insanity, 303, 307; Sheltord on Lunacy, 296.

LYON, J.    The findings of the jury upon the *first*, *second* and *fourth* questions of fact submitted to them are abundantly supported by the testimony ; and the correctness of such findings is not disputed by the counsel for the contestants.    Hence, no discussion thereof is necessary, and we pass at once to consider whether the evidence is sufficient to sustain the finding of the jury that Chafin was of unsound mind when he executed the instrument purporting to be his last will and testament.

Taking the testimony most strongly in favor of the contestants, the claim that the deceased was of an unsound mind when he executed that instrument is based upon certain peculiarities in his opinions, character and conduct, which may be briefly stated as follows :

1. He had faith in the statements of professed clairvoyants, fortune-tellers and spiritual mediums, and in impressions derived from dreams, and, through the influence of one or all of these, he was induced to make journeys to New York, Pennsylvania, Michigan and Iowa in search of mines and hidden treasures, which, of course, he never found.    He also intimated his belief in witchcraft to one of the witnesses.

2. He sometime professed to live without committing sin. He was a man of high temper and strong prejudices, was very positive and firm in asserting and maintaining his opinions, and exceedingly intolerant toward those who did not agree with him in sentiment, especially on political and religious subjects.

He once attempted to shoot a man who, he claimed, persisted in carrying off his wood, and, when prosecuted for it and bailed, said that had he been sent to prison he would have concealed himself in a grove and shot the justice.

3. He had many peculiar notions on mechanical and scientific subjects.    He once thought that he could invent a machine or instrument which would indicate the location of mineral deposits, and tried to do so.    He attempted persistently to invent or discover perpetual motion, or rather some instrument

or apparatus having that quality. He believed that he could invent torpedoes, and perhaps other engines of war, with which the rebel fleets and armies might be speedily destroyed, and he addressed President LINCOLN on the subject. He denied that the earth revolved on its axis, but insisted that the sun revolved around the earth, and presented arguments to sustain his theory. He also denied the correctness of the computations of astronomers to determine the distance from the earth to the sun. He thought that rain could be produced by concussion of the atmosphere caused by the firing of cannon, and he urged arguments in support of this theory also. He owned two small cannon, and offered to bring on rain in a dry time by firing them, if his neighbors would buy the powder; but they refused to do so, and the theory does not seem to have been subjected to an actual test. He had a taste for possessing fire-arms. Besides his artillery, he owned a rifle and a shot gun, and on extraordinary occasions, as on his birth-day anniversary or that of his wife, on election days, fourth of July, and the like, he would frequently fire his artillery by way of celebrating the occasion.

4. He believed that his former wife, from whom he had been divorced, was unfaithful to him, and insisted that he was not the father of her youngest child, who was born while he lived with the mother. He disliked all his children, and frequently denounced them as transgressors and entirely unworthy of his bounty. About two years before his death he stated to a witness that he once staid at the house of one of his sons-in-law, and heard the family up nearly all night, and that he feared they thought he had money, and that they might kill him.

On the other hand it appears that whenever he had the opportunity to bring any of his peculiar notions to a practical test, if the test failed to establish the correctness of his views, he quite readily abandoned them. Thus, after his return from his various journeys in search of mines and hidden treasures, he admitted his failure, and for the last five or six years of his life we hear nothing from him on these subjects. Then again,

when he failed to discover mineral by the use of the machine or apparatus which he invented for that purpose, which was fifteen years or more before his death, it does not appear that he ever alluded to the subject afterwards.

It was also abundantly proved that his judgment upon business matters was sound; that he was industrious and frugal, a good farmer and a close, careful trader. He had a great desire to amass a fortune, and did acquire considerable property before his death. He was not a very liberal or generous man, yet he was strictly honest in all of his dealings.

From these data we are called upon to determine the mental condition of the deceased at the time he executed the instrument purporting to be his last will and testament. It may be observed at the outset, that his various traits of character were so strongly marked, it does not seem difficult to determine from the evidence "what manner of a man he was." A person of merely negative qualities may pass through life, and little comparatively be known of him by the community in which he has lived, and it may be very difficult to delineate accurately the character of such person. Not so, however, with his opposite. The man of positive character and strong convictions, who freely utters his sentiments on all subjects, and gives unrestrained expression to every emotion, "may be known and read of all men."

Bradley Chafin (as he was familiarly called) belonged to the latter class. He was a man of most positive character and most intense convictions, and was entirely unreserved in the expression of his opinions and feelings. His mind was active but undisciplined, and he was visionary and illogical. He was an independent, and, to some extent, an original thinker. He possessed great self-appreciation, but seemed to be quite indifferent to the opinion of others concerning himself. As the professors of phrenology might express it, he had large self-esteem and small love of approbation. He loved wealth, and, having some inventive mechanical genius, thought that he could amass a fortune by means of some wonderful invention.

Hence his apparatus to discover the location of bodies of mineral in the earth, and his attempts to solve the problem of perpetual motion.   He was credulous, and perhaps superstitious; hence his ready belief of the clairvoyants and mediums who ministered to his love of wealth by pointing out to him an easy method of obtaining it.   Hence also his belief in dreams which seemed to indicate to him the location of mines and hidden treasures.   He was suspicious and jealous, which may account for his fears on one occasion that his relatives might take his life, and also for his attacks upon the character for chastity of his former wife, and his denial of the legitimacy of one of her children.   Evidently he never formed any very strong domestic attachments, and his conjugal and paternal feelings and instincts were not sufficiently powerful to save his wife and children from the consequences of his jealousy, his credulity, and his violent, implacable temper.

Such was Bradley Chafin.   It would be more agreeable could his mental portrait be truthfully painted in softer colors. But all that can be done in that direction is to give due prominence to that redeeming trait in his character, his strict integrity in business affairs.

But does all this demonstrate that the deceased was insane ? Ignorance, superstition, jealousy, avarice, self-conceit, violence of temper, unjust hatred of wife and children, may each and all, under certain circumstances, be consistent with the condition of sanity.   These may all be accounted for on the hypothesis of temperament and defective education, excluding entirely the hypothesis of insanity.   Because Bradley Chafin had many peculiarities of character, because he entertained opinions which men generally deem absurd and extravagant, and because his conduct in some respects was eccentric and foolish, we must not, without further reflection, conclude that he was insane.   We must carefully examine these alleged evidences or *indicia* of insanity, and ascertain, if we can, whether they do

in fact prove that he was insane when he executed the instrument which purports to be his last will and testament.

As already intimated, there is not one of these alleged indications that the deceased was insane, which, when considered independently of the others, is not entirely consistent with the hypothesis of sanity. Certainly there are numerous people whose sanity is undoubted, who believe in the supernatural, and who trust as implicitly in the prognostications of fortune-tellers, clairvoyants and spiritual mediums as the deceased ever did, and who also have faith in dreams, and believe in the existence of witches, and in the possibility of perpetual motion as applied to machinery, and of inventing instruments by which mineral deposits may be discovered. Dr. Carver, a very intelligent medical witness, who had been in the western mines, testified as follows: " I have seen hundreds of men in the mountains who came there on dreams, including lawyers, doctors and priests. Belief in clairvoyance is a common thing. Business men here in Monroe have been and searched for minerals under the direction of clairvoyants. Dreams are laid down in books under the head of eccentricities."

There are also large numbers of men of perverted domestic feelings, who hate their wives and children without just cause, or who are violent and bad-tempered, or who cherish the most exalted self-conceit, or who profess to live without sin, or who reject as false the plainest demonstrations of science and adopt as true the most absurd theories, and yet, who are not insane. Such opinions and mental qualities are not, therefore, of themselves, evidence that their unfortunate possessor is insane, although they may be very absurd, and may lead a man to do many absurd and objectionable acts.

The opinions and feelings of the deceased which at first view might seem to indicate insane delusion, are those relating to his family. But an examination of the circumstances will show, we think, that even these fail entirely to establish the

existence of any such delusion. So far as his imputations on the chastity of his former wife, and the denial of the legitimacy of the daughter are concerned, there is really no evidence showing whether the imputation was true or false. The presumption is that it was an unfounded imputation. But we are entirely ignorant of the grounds of Chafin's opinion. It may have been based upon facts and circumstances which would have controlled a better balanced mind than his. It will not do to find the existence of insane delusion in the mind of Chafin without some proof of the fact. As to his alienation from his children, the evidence is that his son entered upon a criminal course of life, and was sent to the state prison of Illinois for some offense; that Chafin had serious trouble with all three of his daughters about business matters, after he was divorced from his first wife; and that the feeling between him and his daughters was mutually unkind and even bitter. Of course, whether Chafin was or was not to blame for becoming alienated from his children, we find in the fact of such alienation a reason, entirely foreign from the influence of insane delusion, why he disinherited them.

His ideas in relation to torpedoes and other implements of war were entertained at a time when much attention was given to those subjects, and many experiments were being made, and it is no evidence of delusion that his active, visionary and inventive mind was turned in the same direction.

Hence we find ourselves unable to point out any single opinion of the deceased, however erroneous, or any action of his, however absurd and unusual, which we can say was the result of insanity or delusion produced by insanity.

Having examined the alleged *indicia* of insanity separately, let us now briefly consider them collectively, and apply to them a few tests recognized by science and approved by the judgment and experience of mankind in general, in order to ascertain whether they are really indications or proof of insane delusion.

. 1.  As a general rule the insane or partially insane do not reason upon the subjects of their hallucinations or delusions. But the peculiar opinions and conduct of Bradley Chafin were the results of processes of reasoning.  He argued against the theory of the revolution of the earth by asserting that if a body be projected upwards perpendicularly from the earth it would fall in the place from whence it was projected, which he claimed could not occur if the earth revolved on its axis.  His premise was correct, but his conclusions therefrom erroneous.  He believed in witches, doubtless because his Bible told him that they existed in ancient times, and he could see no good reason why they should not exist now.  His theory of an apparatus to disclose the location of mines was based upon the idea that like attracted like ; hence in the construction of the same he used the kind of mineral which he hoped to find.  His idea that concussion of the atmosphere would cause rain to fall had for its foundation the fact, which he believed to be well attested, that heavy rainfalls accompanied or followed immediately after great battles.  When he fancied that there was danger, on a certain occasion, that the family of his son-in-law might kill him, it was because he claimed to have heard them up at an unseasonable hour of the night, and he thought that they might be prompted by avarice to take his life.

2.  Generally it is impossible to convince the insane of the absurdity of their delusions by any arguments or actual tests, however conclusive they may be to a person of sound mind. It has already been remarked that whenever Chafin put any of his peculiar notions to a practical test, and found that the test failed to demonstrate the correctness of his views, he freely admitted the failure, and apparently abandoned the notion.  Instances of this kind are mentioned above.

3.  The really insane are usually subject to sudden changes from one delusion to another.  True, this does not always happen, but where the patient is suffering under a settled, long continued delusion, there will seldom be any difficulty in ascer-

tainining whether it is really an insane delusion, or merely an erroneous opinion based upon false reasoning or insufficient evidence. If a man really believes that he is made of glass, or that he is the Christ, or that he is dead, and persists in the opinion, we readily conclude that he is the victim of hallucination or insane delusion, because such opinions are inconsistent with the condition of sanity. But we can draw no such conclusion from the mere belief in witches, ghosts, dreams or spiritual manifestations, or in strange and absurd views on scientific or religious subjects, because such opinions are consistent with sanity. We must find stronger evidences than these of a diseased mind, before we can pronounce the man insane who believes in these absurdities.

There is no evidence to indicate any great changes in the character or opinions of Bradley Chafin. The testimony covers a period of about twenty of the last years of his life, but it fails to disclose in him any of the ordinary and usual changes and freaks of insanity. If his eccentricities and peculiar opinions were really the results of insane delusions, he was strangely persistent in them, never yielding his opinions except upon absolute proof that they were wrong. What he was in 1850, that was he in 1870. Once having conceived a dislike for his former wife and her children, such dislike continued to the end of his life. If he abandoned an opinion, it was because its soundness or unsoundness admitted of actual demonstration, and he had proved it to be erroneous. Opinions not susceptible of such demonstration he never abandoned. If he embraced a new belief, it was clearly referable to some preconceived theory which he believed. In a word, he was always consistent with himself, and his opinions and conduct seem to have been the natural and logical result of his character, disposition and temperament.

4. As an illustration of the last remark, it may be observed that his last will is just such an one as it might reasonably be supposed he would make. Who that knew the rugged nature

of Chafin, and his settled dislike, almost hatred, of his children, could suppose for a moment that he would do otherwise than disinherit them? He had conceived the idea several years before his death, of giving his last wife the use of his real estate during her life, with remainder to some public object. Who that knew his persistence could doubt that this general idea would control him in the final disposition of his property?

It may as well be observed in this connection, that the three physicians who testified as experts on the trial were all of the opinion that Chafin was not insane, at least two of them were of that opinion, both of whom had known him personally, and the other, who had no personal acquaintance with him, did not express a contrary opinion. This professional testimony is entitled to considerable weight in determining the question of the sanity or insanity of Chafin. The fact that his business capacity remained unimpaired is also very significant. It is scarcely credible that his mind could have been as extensively diseased as it is claimed to have been, and for so long a time, and still his capacity in that respect remain entirely unaffected thereby.

But it is deemed unnecessary to pursue the investigation further. Whether the alleged *indicia* of insanity be considered separately or collectively, there are so many facts and circumstances proved in the case which refute the claim that the peculiarities or absurdities in the opinions and conduct of Bradley Chafin were the result of hallucination or insane delusion, and so little testimony of the contrary tendency, we are impelled to the conclusion that he was of sound and disposing mind and memory when he executed the instrument propounded as his last will and testament, and that the jury ought, under the evidence, to have answered the *third* question submitted to them in the affirmative.

All of the cases cited by the counsel for the contestants have been carefully examined, and we find nothing in them opposed to the views above expressed. All or nearly all of them pre-

sent clear and unmistakable examples of partial insanity, or insane delusion, more or less extensive, and were doubtless correctly decided. But we find no case or authority which will warrant us in holding that Bradley Chafin was not of sound mind when he executed the instrument in question.

It was held in the *Jackman Will Case*, 26 Wis., 104, that a verdict in a case of this kind has substantially the same effect as a verdict on a feigned issue in chancery, and if it is clearly contrary to the weight of evidence, refusal of a new trial is error. Being of the opinion that the verdict in this case is clearly contrary to the weight of evidence, we think that the motion for a new trial should have been granted. Having reached this conclusion on the evidence, it is quite unnecessary to review the instructions given or refused by the learned circuit judge.

The judgment of the circuit court must be reversed, and the cause remanded for a new trial.

*By the Court.* — So ordered.