Wait v. Westfall.

## WAIT ET AL *v.* WESTFALL.

[No. 19,902. Filed October 7, 1903. Rehearing denied January 8, 1904.]

WILLS.—*Contest.*—*Dismissal.*—*Renewal of Suit.*—The voluntary dismissal of a suit to contest a will will not preclude the plaintiff from renewing the suit at any time within the limitation provided by §2766 Burns 1901. *pp. 650–652.*

SAME.—*Appeal.*—*Assignment of Error.*—Only matters of law can be assigned as error on appeal from a proceeding to contest a will. *p. 652.*

SAME.—*Testamentary Capacity.*—*Insane Delusions.*—*Monomania.*—Evidence that testator had insane delusions is insufficient to set aside a will on the ground of mental incapacity, where it is not shown that the delusions controlled or in some manner affected the execution of the will. *pp. 652–667.*

From Marion Circuit Court (10,150); *H. C. Allen,* Judge.

Suit by Harriet Westfall against Joseph Wait and others. From a judgment for plaintiff, defendants appeal. *Reversed.*

*Samuel Ashby* and *L. J. Kirkpatrick*, for appellants.
*W. V. Rooker*, for appellee.

Hadley, J.—On September 30, 1886, Clark Wait had living his childless second wife, Nancy, and three children of a former marriage, namely, Joseph Wait, Martha Offenbacker, and Minerva Dotteror. The three children were married and had families of their own. A son, William, had deceased, leaving a widow and one child, Harriet Westfall, surviving him. He was also the owner of personal property and two tracts of real estate of eighty acres each. On the date above mentioned Wait executed his will, by which he bequeathed to his wife, Nancy, a life estate in the home eighty, with remainder over in fee to his daughter Martha Offenbacker, and to his son Joseph Wait the rents and profits of the other eighty-acre tract for and during the life of his wife, Nancy, with remainder over in fee to his daughter Minerva Dotteror. The fifth item of his will is as follows: "I give and devise to my son Joseph Wait, in addition to the rents named above, all my personal property, not taken by the widow, including notes and accounts of all kinds whatsoever, except the notes and accounts I hold against the estate of my son William, deceased; these I order my son Joseph to deliver to the family of my said son William." More than eleven years after the execution of this will, to wit, January 28, 1898, the testator died, leaving as his only heirs at law the beneficiaries named in the will and his said granddaughter, Harriet Westfall, who is the appellee in this appeal. The will was duly admitted to probate, and letters testamentary issued to appellant Charles Negley. Appellee on June 8, 1898, brought an action in due form in the Marion Circuit Court against these appellants, to contest the va-

lidity of said will, which action she voluntarily dismissed on the 2d day of February, 1899, and on January 25, 1900, filed another complaint against the same parties to contest, assigning the same grounds as in the former suit, namely, undue execution, duress, and unsoundness of mind of the testator. The defendants answered in four paragraphs. The first a general denial. The other three, pleaded in bar, set up in various forms that the plaintiff on the 8th day of June, 1898, commenced in said court an action to contest said will against the identical parties, and for the identical causes; that the parties (these defendants) all employed counsel at great expense, and appeared to said action, and filed answer, and the cause was put at issue and set for trial, and, to avoid a hearing and determination by the court, the plaintiff, failing to prosecute in accordance with the condition of her bond, on February 2, 1899, before the day set for trial, voluntarily dismissed her said complaint, and suffered judgment for costs; that the plaintiff has fully enjoyed her statutory right to contest; that there is no merit in her complaint, and the same is brought further to annoy, harrass, (and vex the defendants. Trial; verdict and judgment for the contestant.

1. A demurrer to each of the affirmative answers was sustained, and these several rulings present, in the concrete, the single question, did the voluntary dismissal of her former action preclude appellee from renewing it within the limitation provided by the statute? The statute is that any person may contest the validity of any will at any time within three years after the same has been offered for probate. §2766 Burns 1901. The institution of a suit and its voluntary dismissal without a trial is not a contest. A contest implies a trial and a final judgment; such a hearing as will amount to an adjudication of the validity of a will. The statute creating the right of contest prescribes the period in which the action may be

brought. It does not pretend to regulate the number of suits that may be instituted. Neither does it provide any special penalty for the voluntary dismissal of a proceeding to contest a will which has been untimely or improvidently brought. A period of three years is given a plaintiff for investigation and decision. He may begin at any time within the period, and carry the proceeding forward to final judgment even after the period has expired. And we find nothing in the statute or in the nature of the action to prevent him from dismissing his suit as any other plaintiff, without prejudice, if before trial he becomes convinced that the facts or witnesses relied upon are untrustworthy or insufficient to entitle him to recover. Nor do we find anything in the statute to prevent him from renewing the same at any time within the statutory period, if, from the discovery of new facts or witnesses, he desires to do so. The only penalty we know of for the bringing and the voluntary dismissal of a civil action, including one of this class, is that the plaintiff shall pay all costs he has occasioned. This, generally, he must do before he is authorized to renew his suit. While the costs of a dismissed action remain unpaid, the commencement of a subsequent suit for the same matter will be presumed to be vexatious, and will be stayed by the court upon a proper application until paid, unless the plaintiff shows affirmatively that the second action is not vexatious, but excusable, and in good faith. *Kitts* v. *Wilson*, 89 Ind. 95; *Harless* v. *Petty*, 98 Ind. 53, 56; *Clemans* v. *Buffenbarger*, 106 Ind. 16; *Cushman* v. *Brownlee*, 128 Ind. 266; *Carrothers* v. *Carrothers*, 107 Ind. 530; *Eigenman* v. *Eastin*, 17 Ind. App. 580. Therefore, since the answers do not seek a stay of the cause until the plaintiff has paid the costs of his former suit, but go in bar of appellee's right to renew the contest, though but one year had elapsed since the will was offered for probate, they are insufficient. To sustain them would be in effect to hold that

a voluntary dismissal of a pending suit to contest a will is equivalent to a contest within the meaning of the statute; and this we can not do. The demurrer to each of the answers was properly sustained.

2. Appellants have assigned as error the action of the court in adjudging the will invalid upon the verdict of the jury, upon the ground that it was not sustained by the evidence, they claiming the right, under §2775 Burns 1901, to assign, on appeal to this court, error on questions of fact, as well as of law, for our consideration and decision from the field of the evidence. The argument is that §2775, *supra,* prescribes a rule of procedure in the special proceeding to contest a will, and the practice in this court on appeal is not therefore governed by §667 Burns 1901 (§647 of the civil code). The question has long since been decided against the position here assumed, and we have not been persuaded that the previous ruling is incorrect or should be modified. *Coffman* v. *Reeves,* 62 Ind. 334; *Eckert* v. *Binkley,* 134 Ind. 614, 620. It may be considered as thoroughly settled, under the existing code of practice, that in all cases triable by jury this court will not undertake to determine questions of fact from the weight of the evidence.

3. It is earnestly insisted by appellants that their motion for a new trial should have been sustained because the verdict of the jury was not sustained by sufficient evidence. At the proper time the court directed the jury that they should return their verdict for the defendants, unless they should find from a preponderance of the evidence that Clark Wait at the time he executed the will was of unsound mind. There is no complaint by appellee of this instruction, and no claim that her case was made out on any other theory. The case will therefore be treated as if the want of testamentary capacity is the only ground of contest relied upon. The evidence upon this issue is very voluminous, covering more than 1,400 typewritten pages. There is sub-

stantially no conflict to be found in the evidence, and abso-
lutely none on any important question of fact.   The verdict
rests upon the following:   The testator in early life was
prostrated with heat, and carried to the house in an un-
conscious condition.   Ever after that event he was dis-
tressed by the hot sun, frequently complained of severe
pains in the head, died at eighty-five, and during the last
twenty years of his life was afflicted with disease of the
kidneys and bladder, and occasionally with neuralgia and
rheumatism.   On September 30, 1886, when at the age
of seventy-three, he called at the house of his neighbor,
a justice of the peace, and an acquaintance of thirty years,
and requested the justice to prepare his will.   He expressed
the desire that the business be privately transacted, and
that no one else be admitted to the room, and upon his
suggestion the justice locked the door.   At the time he
had living his childless second wife, three children, and
two grandchildren, the children of his deceased son Will-
iam.   In directing the justice as to the provisions of his
will he made no mention of his grandchildren, nor of their
deceased father's family, whereupon the justice inquired
what he was going to do, if anything, for William's fam-
ily, and he remarked, "nothing;" that "he had given Will-
iam all he intended, and did not propose to give the chil-
dren anything."   Upon being advised that it would be at
least safer to mention them in his will, he directed a pro-
vision that certain notes and accounts, amounting to about
$1,000, he held against William's estate be turned over
to his family.   There was no estrangement between the
testator and his grandchildren, and he frequently mani-
fested affection for them.   At one time, accompanied by
his little grandchild, he got lost and wandered for some
time in his own woods pasture while hunting his cows
in the daytime.   At another time, in the evening, accom-
panied by his wife, he became bewildered and lost in his
own field, less than a quarter of a mile from his house,

and had to be extricated and conducted to his house by a third person, and was found to be greatly perturbed and crying. In 1880 he failed for some time to recognize a relative of his wife whom he had known for several years. Later on he failed to recognize, when first addressed, one of his debtors whom he had known for a long time, and who had called to pay a note.

For thirty years prior to his death the testator was imbued with the belief, which he expressed to some of his friends and acquaintances, that he possessed the power to locate hidden treasure, and that his farm and other farms in the neighborhood contained treasure which had been concealed there by the Indians. He asserted that the hidden money was enchanted; that it was controlled by some mysterious force that would withdraw it further into the earth when disturbed by unusual noises. His method of procedure in locating treasure was by the use of a small mineral ball, top shaped, which he carried swinging from his hand by a fine string, and which directed him by its vibrations, and final whirling around when the spot was reached. In the twenty years prior to the execution of the will he made frequent efforts to find the hidden treasure; sometimes on his own farm, and sometimes on the farms of others; sometimes alone, and sometimes in company with others, and in both day and night-time. Always, while engaged in digging for it, he would himself observe, and would enjoin upon others, absolute silence, assigning as a reason that a word spoken, or any confusion created, would break the charm, and the money would pass on into the earth. He claimed the money was in a pot. On one occasion when the pot had been reached it began to move away, and the digger struck at the pot with his pick, and broke the bale off. On another occasion, while engaged in digging, he heard a great noise and upon looking up he beheld a herd of wild cattle rushing towards him, and when they arrived at the fence they hurled the rails thirty

feet into the air. He fled, and the cattle having reached his digging, stopped, bellowed, and soon departed. The effect of the cattles' presence was to break the charm, and permit the money to escape. On another occasion he claimed that wild horses approaching with the noise of distant thunder prevented his recovery of the money; on another, that a great storm came up and drove him away with a deluge of water that engulfed everything, but the next morning the place was perfectly dry. On another occasion, while engaged in digging, the hole suddenly darkened, and on looking up he beheld a huge millstone suspended above him by a thread, and a giant negro standing by with scissors ready to cut the thread and cause the stone to fall upon him. Another time he ascribed his failure to the want of snake oil, and endeavored to find some. He also fashioned an iron spear three or four feet long which he would sometimes cause to be driven into the ground at the spot indicated by his metallic ball, to fasten the money, and then direct others to dig around the spear to its bottom.

On the other hand, the defendants proved without any contradiction that the testator was born in Ohio in 1813, and, being poor, left home early in life to make his own way in the world. He had a meager education, was married at twenty-four, and had by his first wife eight children, four of whom died in youth, and four—two boys and two girls—lived to man and womanhood. His first wife having died, he was married again in 1854 to Nancy, who, childless, now survives him. In 1837 he settled on a farm in Hancock county, where he resided until 1854, when he purchased and moved to the eighty acres where he continued to reside with his family until his death which occurred January 21, 1898. He supported his family in comfort; gave his children a common-school education, and by his industry, frugality, and business ability was able to pay for his farm, and accumulate money and property,

with which he purchased another farm of eighty acres, in 1864, and loaned to his children, to wit, William, $920 in 1864 to 1879; Joseph, $410 in 1873 to 1878; and Martha, $300 in 1882; none of which seems to have been repaid, and at his death left a personal estate, chiefly notes and accounts, appraised at $4,477.69. Up to the time of his death he had, and always had, the active and absolute control of all his farming operations; made repairs, constructed fences, drains, and buildings; kept his improvements in good condition, his crops rotated, and his barnyard, fields, pastures, and fence corners clean and free from weeds; made and settled all contracts with his tenants and others; fed, bred, and sold his stock; listed his property for taxation, paid his taxes, and never in a single instance suffered a delinquency. He provided liberally for his family; was kind and courteous to others; exchanged frequent visits with his neighbors; was a regular attendant upon his church and lodge (Masonic), promptly paid his quarterage and dues; and contributed to his political party. During the period inquired of he was called on many times as an appraiser of property in the settlement of decedents' estates. In the same year the will was executed he was chosen as the leader and spokesman for a delegation of citizens of his community to appear before the county board of commissioners in advocacy of the straightening of a certain highway about which a spirited neighborhood controversy existed. He presented his side clearly and logically in a fifteen-minutes address, and won the judgment of the commissioners to his side. In the same year he was selected by two of his neighbors as a referee of a business controversy, and upon affidavits of the parties and witnesses decided their case to the contentment of both parties. In 1885 he was appointed by the Marion Superior Court, and again in the spring of 1886—but four months before he executed his will—by the Marion Circuit Court, upon the recommendation of

the parties in interest, as a commissioner to make partition of large tracts of land, and in each instance took an active and leading part in the business; and was appointed and acted as a commissioner in partition in 1892, six years after he made his will. In the last twenty-five years of his life he loaned sums of money on personal surety, in all making more than one hundred such loans, and never lost a dollar from insufficient surety. Except in a few instances, for cause, he wrote his own notes, and invariably counted the money, and computed the interest. In the execution of his will he furnished the scrivener from memory a correct description of his real estate, the general description and value of his personal property, and dictated every provision of the instrument. His conversation was always intelligent and connected. The scrivener and subscribing witnesses are clear and emphatic that he was of sound mind when he executed the will, and of his neighbors twenty-one expressed a similar opinion, while, on the other hand, only one—the plaintiff's mother, who had not visited the testator for sixteen years before his death, and had not seen him for more than a year prior to the making of the will, nor for several years subsequent thereto—entertained the opposite opinion.

Except his weird fancy concerning the hidden treasure, and the happenings attending the search for it, there is not in all this mass of testimony a trustworthy sentence inconsistent with sanity. We may assume from the scope of the testimony that the contestant has scanned the testator's eighty-five years of life, and looked into every nook and corner for an unusual or unnatural act or speech, and that that which she presents us is the sum total of the *indicia* of mental unsoundness. What does it show? Our attention is first called to the fact that while engaged in making his will the testator expressed the desire that publicity be avoided. We can not accept this circum-

stance as of the slightest importance in characterizing the condition of his mind. The wish expressed to have others excluded from the room during the preparation of the instrument was in accord with the usual conduct of men. We deem it common knowledge that ordinarily persons of unquestionable sanity, when engaged in the solemn act of making a testamentary distribution of their property, which means a distribution contrary to the rules of descent, endeavor to withhold the act from public gossip.

The two incidents of the testator becoming lost we find to be of the same character, if not even more frivolous, when we examine them in the light of their own facts. It is shown that five or six years after making the will, and when seventy-eight or seventy-nine years of age, and of greatly impaired vision, he went one evening, attended by his little grandson, into his thick woods pasture to drive up the cows, and while engaged in wandering through the bushes searching for the cows he became turned around —that is, the points of the compass became reversed in his mind—and he kept going in the wrong direction until he arrived at a fence, where he beheld and recognized a neighbor's house near by. He promptly righted things in his mind, and then went to the house, told, laughed, and joked about getting lost in his own woods, and after a twenty-minutes visit, during which time divers things were talked about, he departed for his home, three-fourths of a mile distant, accompanied by no one but his six years old grandson, and according to the testimony of Mrs. McConnell, who had lived by him and known him intimately for fifty years, "he just came like he always did, when he came to our house, laughing and joking, and appeared as well as I ever saw him." The other incident occurred in the spring before he died, and twelve years after the will was made. The testator and his wife went one evening at nightfall to the creek, fishing, with a tenant who resided on the farm. At the time the testator was in his

eighty-fifth year and his wife ·in her eighty-sixth. The testator made the most successful catch of the trio. At 9 or 10 o'clock at night the party left for home. There was no moon, and but little light from the stars. The old people carried a lantern, and their progress was so slow that when they arrived at their field, about a fourth of a mile from their house, the tenant left them, and went directly home. Later, and when they should have been at home, the tenant observed a light wandering about in the field, and upon going down found the two arm in arm, lost, and in a spirited controversy over the right way to go. As said by the witness, "The old man was frustrated and aggravated because his wife would not go the way he wanted her to, and he cried a little." When assistance reached them they proceeded to the house with composure, the testator asserting to the tenant that "he need not ask him again to go fishing after night." When we consider the time of life, the physical strength, the impaired vision, the susceptibility of most persons to become erroneously impressed as to directions, the impossibility, in the first case, to see beyond the bushes immediately about him, and, in the other, beyond the sweep of the lantern he carried, over the trackless field in the dark, the incidents become commonplace and natural and afford not the slightest evidence of a deranged mind.

The same may also be said of the failure of the testator to recognize his wife's kinsman, whom he seldom saw, who lived sixteen miles away, and who drove up to the gate and from a distance inquired if two travelers could have breakfast. The recognition was prompt and cordial when the name was announced. Nor is the failure to recognize his debtor, when first addressed by him, which was ten years after the will was executed, of any greater importance. He was also promptly recognized when he came within the testator's range of vision. Such things are but ordinary and common happenings among the aged, and un-

worthy of consideration as evidence of a want of testamentary capacity.

His belief concerning the hidden treasure was not wholly a delusion. In large part it was a belief founded on false evidence. For a long time before he moved into the neighborhood there prevailed there a tradition that a vast treasure was concealed by the Indians somewhere in the vicinity. Many local residents believed it, and had searched for the money, and parties had been, and came there afterwards, from Indianapolis, Kentucky, Anderson, Fortville, and other places, to hunt for it. One witness testified that the seekers dug so many holes in his woods they became a nuisance, and he had to stop it. At least one other man in the vicinity claimed the power to locate the treasure by the use of a metallic ball such as the testator used, and one other claimed the power by the use of a divining-rod. Wait claimed that some others could successfully use his ball, and others could not, and as to this one witness testified that he tried it, and it would not work. Another testified that being at Wait's house inspecting the ball, the testator went into another room, and, returning, informed the witness that he had concealed under the carpet a silver dollar. Witness took the ball, suspended it from his hand, as directed, and went into the other room to determine whether the ball would locate the silver dollar for him. He wandered slowly about the room for some time swinging the ball near the floor, when at last the ball began to vibrate, and, following in the direction of the vibration, when he reached a certain point, without any apparent cause, the ball began to revolve rapidly. He then approached the spot from other directions, with the same result, and upon lifting the carpet he found the dollar immediately below. This witness found the action of the ball exactly as claimed for it by the testator.

What tribunal occupied by finite beings is qualified to adjudge false, asserted forces of attraction and magnetism,

or the phenomena of mind, because incapable of demonstration, or that certain supernatural powers and influences do not exist, because not in accord with an assumed standard of mental action? In all ages of the world instruments and devices have been employed in locating minerals in the earth. The fact is notorious that there are many intelligent, conservative persons who claim the power of locating water in the earth by the use of a forked stick, and thousands of wells located by them have been dug, and are still being dug. It is equally a matter of common report that such a stick will point downward at particular places in the hands of some men, and not in the hands of others. Many scholars and successful business men sincerely believe in spiritualism, and of being able, not by all, but through the instrumentality of a particular few naturally qualified persons, called "mediums," to converse with and be advised by the spirits of departed friends, and believe they recognize the voices and handwriting of the dead. Mental phenomena are as various as the hues of an autumnal forest. In *Chafin's Will*, 32 Wis. 557, 564, it is said: "Dr. Carver, a very intelligent medical witness, who had been in the Western mines, testified as follows: 'I have seen hundreds of men in the mountains who came there on dreams, including lawyers, doctors, and priests. * * * Business men here in Monroe have been and searched for minerals under the direction of clairvoyants.'" Others believe in christian science; others in clairvoyancy; others in the transmigration of souls; and others in witchcraft. To affirm or deny the truth of these things proves nothing, and demonstrates the individual to be neither a sage nor a fool. Who shall be the judge whether the mind that accepts or rejects them is the truly sane mind? If we affirm that witches do not ride broomsticks and practice their evil arts upon us, and that there are no witches, then we have Blackstone, the father of our common law, Chief Justice Matthew Hale, Coke, Sir Francis Bacon, Richard

Baxter, John Wesley, Martin Luther, Kepler, Cotton Mather, and a host of other eminent jurists and savants, against us. Encyclopedias; Nevins, Witchcraft in Salem Village; Upham, Salem Witchcraft; 2 Campbell, Lives of the Chief Justices.

Early in the history of our jurisprudence much difficulty, for the reason above suggested, was experienced by the courts in fixing a standard of intellect by which testamentary capacity could be determined; and legislative bodies were not inclined to relieve the courts of their embarrassment. For instance, our statute for more than a half century has provided that all persons except infants and persons of unsound mind may make a will. Similar statutes have long prevailed in other states of the Union and in England. In construing these statutes, the courts of both this country and England were at first disposed to hold that any mind possessed of an eccentricity, aberration, or erratic trend, such as amounted to an insane delusion, was not a sound mind within the meaning of the statute, and hence incapable. This doctrine, however, has long since been repudiated by the courts of England, and for the most part, at least, by the courts of this country; certainly by this State since *Teegarden* v. *Lewis,* 145 Ind. 98. Under the law as now settled, capacity is not determined by what one believes, nor by the character of the horrid tales he can tell. The test is, putting aside all perversion, peculiarities, and hallucinations of the mind, does there remain in the subject an untrammeled intellect sufficiently strong and rational to know the extent and value of his property, the number and names of those who are the natural objects of his bounty, their deserts with reference to their conduct and treatment towards him, and memory sufficient to carry these things in mind long enough to have his will prepared and executed. See cases collected in *Teegarden* v. *Lewis, supra,* at page 103. If a testator has mind enough rationally to grasp the subject and details

of the testamentary act, it makes little difference what he believes and tells concerning hidden treasure, spirits, spooks, and supernatural things.

Mental capacity, therefore, is to be measured by its relations to the subject of the will. Delusions or monomania relating to subjects foreign to the testament, and to the persons affected thereby, involve no more likelihood of actual inacpacity than many other latent causes; and when associated with uncontradicted proof, as in this case, that the acts of the testator in the conduct of his business affairs, and in his social and domestic relations, were uniformly intelligent, rational, and reasonable, proof of strange and unreasonable beliefs, and of wild and absurd stories, standing alone, can not be termed evidence of a want of testamentary capacity.

A belief in witchcraft, and that the disinherited children were witches and practiced their infernal arts upon the testator, of itself is not sufficient evidence of mental incapacity to make a will. *Addington* v. *Wilson,* 5 Ind. 137, 61 Am. Dec. 81.

In *Thompson* v. *Thompson,* 21 Barb. 107, the testator had a rod with which he claimed to be able to locate hidden treasure. He asserted that another took the rod in his hand, found the treasure, struck a crowbar in it, and commenced digging. Just as he broke the ground, an immense black and white bull, apparently as large as a mountain, came running over the hill lashing his tail in the air, stopped at the digging, pawed and hooked the earth, and then departed. While this was going on about one thousand other cattle ran over an opposite hill, acting as the bull. He failed to get the money because the spell was broken by the cattle. At times he would fall down and cry out in great agony, and declare he was being hugged by a ghost. His housekeeper having dreamed that horses which had cost him $250 would run away and kill him, he traded them off next day for one horse worth but $10.

He affirmed that there were spirits in the air, that they tormented him in sickness, and that he had seen the devil in the form of a bull. The general term, in affirming the opinion of the surrogate sustaining the will that gave a $300,000 estate to charities and away from grandchildren, except $15,000, said: "Erroneous, foolish, and even absurd opinions upon certain subjects do not show insanity when the person entertaining them still continues in possession of his faculties discreetly conducting not only his own affairs but the business of others."

In *Bonard's Will,* 16 Abb. Pr. N. S. 128, the testator believed that at death the souls of men pass into brutes, and, better to provide for the comfort of his soul, bequeathed his entire estate of $50,000 to the Society for Prevention of Cruelty to Animals. In sustaining the will the surrogate held that this opinion and act, though eccentric, was not evidence of insanity or incapacity.

In *Smith's Will,* 52 Wis. 543, the testator disinherited his children, and bequeathed all his property to his childless second wife. He was an ardent spiritualist; married his beneficiary, as he claimed, on advice received from his dead wife. He often consulted spirits, and acted upon their advice in his business affairs and in his inventions.

In *Matter of Vedder,* 6 Dem. Surr. 92, the testatrix willed all her property to her husband. She frequently talked to her neighbors about hidden treasure, and how. to find it; would put irons in the cream to make the butter come; could not keep her horses fat because witches rode them at night; saw a headless horseman ride across her field; could see lights over certain spots on her farm, where if one would dig at midnight he would find gold; advised her neighbor to put live coals and a red garter under her churn to speed the butter; took her nephew to dig for gold on the farm, and had him carry a red rooster under his arm for luck; saw the Lord Jesus with a sword, and the angels about him. See similar cases collated by the

learned surrogate in the latter case.   See, also, *Chafin's Will,* 32 Wis. 557; *In re Brush's Will,* 72 N. Y. Supp. 421; *Brown* v. *Ward,* 53 Md. 376, 36 Am. Rep. 422; *Middleditch* v. *Williams,* 45 N. J. Eq. 726, 17 Atl. 826, 4 L. R. A. 738; *Otto* v. *Doty,* 61 Iowa 23, 15 N. W. 578; *Lee* v. *Lee,* 4 McCord (S. C.) 107, 17 Am. Dec. 722; *Turner* v. *Hand,* 3 Wall. Jr. 88, 120.

The will in each of these cases was sustained on the ground that it appeared the testator, notwithstanding delusion, aberration, and eccentricity in certain matters of belief and speculation, was able and did manage with intelligence and discretion the ordinary business affairs of life, including the acquisition and disposition of property, and it was not shown that such peculiar and erratic beliefs in any way affected the testament; and in each the doctrine is maintained that if such eccentric or deranged attribute of the mind keeps aloof, and does not enter into the usual concerns of life, and does not affect the relations of the testator to the natural objects of his bounty, nor his sense of duty towards them, nor the distribution of his property to them, it is not even evidence of general insanity, or of a want of testamentary capacity.

In this case, therefore, while evidence that the testator had an insane delusion in respect to hidden treasure was competent on the general subject of incapacity, yet, however sufficient, it falls short of entitling the contestant to the verdict.   She has undertaken to establish the invalidity of Clark Wait's will for want of testamentary capacity. The burden is upon her to prove that which she affirms. The task is not performed by establishing the delusion— for the testator may have both the delusion and testamentary capacity—and she must go further and prove that the delusion controlled or in some manner affected the execution of the will, before her evidence is sufficient. *Young* v. *Miller,* 145 Ind. 652; *Roller* v. *Kling,* 150 Ind. 159.   This latter the contestant has not attempted to do.

In all this volume of testimony there is not a trace anywhere to be found that the belief or weird fancies of Clark Wait concerning the hidden treasure affected his relations with his family or any part of his will. No member of his family ever opposed or assisted him in his belief or enterprises; nor criticised or sympathized with him therein, so far as this record discloses. There is no question of conflict in the evidence before us. It is shown that he was kind and indulgent to all his children; quite as much so to William and his family as to others. As other of his children, he loaned money to William at divers times through a series of years, which appears to remain unpaid. In 1882, when William and his wife were both severely ill, he took both and their two children into his family and cared for them for three months. After the death of his son his grandchildren visited him frequently, and at no time did he manifest or profess a want of affection for them. He is also shown to have been a man of more than average intelligence; industrious, sagacious, and successful in the conduct of his farming affairs; discreet and accurate in loaning his money; chosen by his neighbors and the courts as many as four times in the same year in which the will was executed to act on behalf of others, to present for them a public question to the commissioners, to settle a business controversy between neighbors, and to make partition of real property. Undoubtedly he enjoyed the use of his faculties, and was of sufficient understanding to manage his affairs and transact his business with usual shrewdness to the day of his death. It is also manifest that his neighbors who had lived by him and associated with him for twenty-five to fifty years, and knew him best, had confidence, not only in his sanity, but in his fairness and good judgment. He was thus trusted by the people and the courts both before and after the execution of the will, to settle disputed rights among neighbors, and to appraise and divide the property of others, and we perceive from

this record no ground for denying him the right to dispose of his own property as he pleases.

We therefore hold that the verdict of the jury was contrary to law, and appellant's motion for a new trial should have been sustained.

Judgment reversed, and cause remanded, with instructions to grant appellant's motion for a new trial.