[Civ. No. 9417. First Appellate District, Division Two.—July 18, 1934.]

In the Matter of the Estate of HENRY HOOVER, etc., Deceased. GERTRUDE HOOVER, Appellant, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a Corporation) et al., Respondents.

Owen D. Richardson for Appellant.

E. M. Rea and Maurice J. Rankin for Respondents.

SCHMIDT, J., *pro tem.*—On April 21, 1931, the decedent, Henry Hoover, made his will. Thereafter he made codicils to such will dated respectively September 18, 1931, September 23, 1931, October 8, 1931, and October 10, 1931. In the will of April 21st, Henry Hoover, after bequeathing four legacies totaling $14,000, gave the entire residue of his estate to Gertrude Hoover, his daughter and only child, the appellant herein; and appointed the Bank of America (now Bank of America National Trust and Savings Association) executor, the respondent herein. By the codicil of September 18th, he recites the execution of a deed to his daughter of date September 10, 1931, and that same was made while he was under the influence of opiates. He confirmed the gift of certain cashier's checks in lieu of bequests mentioned in the will of April 21st and reaffirmed the residuary clause of said will. The codicil of September 23d provided for his funeral expenses. The codicil of October 8th, hereafter referred to as the "trust codicil", adds legacies and sets aside or "modifies" the residuary clause of the will in favor of his daughter and creates a trust of said residue with the said Bank of America, as trustee, the "net income" of said trust to be paid to his said daughter Gertrude during her lifetime and all of the property remaining at her death to go to "my heirs then living". In this codicil he recites:

"I declare that although my daughter Gertrude Hoover in the last month has annoyed me, cursed me, threatened me that she would not bury my body in the crypt which I purchased therefor, filed an injunction suit against me and a petition to be appointed my guardian, that I am not doing this to punish her, but have come to the conclusion that on account of her character and disposition and lack of business ability that this trust is for her best interest.

"I also declare that on September 10, 1931, on account of the threats of my said daughter Gertrude Hoover I signed a deed to her of my real estate. I declare that I was under opiates at the time of signing said deed, that misrepresentations were made to me by Gertrude Hoover in regard thereto, and if I am unable before my death to file a suit to set aside said deed, I wish my executor to file such an action. If I have filed such an action, I desire my executor to proceed therewith to the end that all of said property may be included in said trust."

The last codicil, dated October 10th, confirms a deed to two nieces of decedent as to their right and interest in one piece of real estate. Henry Hoover died December 27, 1931, leaving an estate which inventories over $146,000. The Bank of America filed its petition for the probate of the aforementioned will, together with the aforementioned codicils. The daughter, Gertrude Hoover, filed her contest to the admission to probate of said documents. Before said contest came on for hearing she filed a dismissal of her contest "without prejudice". The will with the codicils was admitted to probate. Thereafter, the daughter, appellant herein, filed her petition for revocation of probate of said will and the codicils, setting forth as grounds of contest that said will and each of the codicils was the result of undue influence exercised upon the testator by one Waldo H. Lowe, an employee of said Bank of America and confidential advisor of the deceased, and one E. M. Rea, a confident of Lowe and also attorney for the deceased.

Upon the trial of the contest contestant waived any and all objections to the will itself and to each of the codicils except the "trust codicil", dated October 8th.

The contestant Gertrude Hoover testified that she was the only child of the decedent and Jennie Hoover; that Jennie Hoover died in 1926 in Detroit, Michigan; that her father

and mother accumulated all their property after they were married in 1873; that in 1900 her father, mother and herself met and her father then stated he would never make a will and never give any of the property away or dispose of it; that if his wife died first the property would go to his daughter. He said, ''I will never make a will, I promise you, and all the estate will go to you and your mother''; that she said she would care for her father and mother and care for them all her life; that in 1917 her father made deeds of his property and in 1918 made a will that he tore into fragments, which fragmentary will was offered and received in evidence, containing amongst its provisions, ''I give devise and bequeath all the residue and remainder of my estate to my wife Jennie Hoover and my daughter Gertrude Hoover. I hereby confirm any and all deeds heretofore made by me in their favor''; that she obtained these fragments of will from her mother, who obtained them from the janitor. ''The janitor, from the building, in my father's office brought them and gave them to my mother.'' The evidence does not show whether said purported will had ever actually been executed by Henry Hoover. She further testified that on May 1, 1923, her father, her mother and herself signed a paper purporting to be ''Community Property Family Agreement between husband, wife, & daughter Henry, Jennie & Gertrude Hoover'', in which Henry Hoover agreed to give all the community property accumulated since marriage in September, 1873, ''to my wife Jennie Hoover, and our daughter Gertrude Hoover, which they have worked in joint efforts to help me accumulate. I hereby agree to *never* make a Will, or to will any part of the estate away . . . & this agreement dates back to eighteen hundreds, and there was an agreement again made in 1900 a verbal lifelong agreement which was legal verbally at that time to never make a Will . . . So I hereby agree to give all of my & my wife's estate of community property to my wife & daughter, and in case either is gone to go all to the other with no restrictions or orders as to their disposal . . . ''; that after the death of her mother her father made an holographic will on August 14, 1926, by which will he gave all the rest and residue of his estate to his said daughter Gertrude Hoover. That in 1928 her father's disease became noticeable; it was cancer of the bladder; he entered the

San Jose hospital in July, 1931, remaining there until his death on December 27, 1931; she visited her father nearly every day and they were quite friendly until one day she was told by the lady in charge of the hospital office that she was not to go to her father's room without being watched and that when she then went to his room a nurse met her in the hall and watched her every minute she was in the room; that in the latter part of September she was refused admittance to her father's room; that in the last days of September, about the 20th, between 7 and 8 o'clock in the evening, she went to her father's room through the emergency entrance of the hospital, pushed the door partially open, heard someone talking to her father; that it was E. M. Rea; that she heard Mr. Rea say that she did not know how to take care of the ranches or the property and that he ought to put the estate in trust; Mr. Rea also said she was crazy. She testified that she was not insane and was not insane at that time; that Mr. Lowe was always advising her father and had advised him for many years; that her father had told her that he relied upon Mr. Lowe's advice and that Mr. Lowe and her father had a joint safe deposit box in the Bank of San Jose.

Several witnesses called by the contestant· testified to statements made by the decedent over a long period of years in which he expressed his intent to leave his property to his daughter.

She also called as her witness one Laura T. Roumasset, who testified that she was the nurse who waited on Henry Hoover every day of the five months he was at the San Jose hospital; that his disease was cancer of the bladder; that during that period he was under the influence of opiates most of the time. This same witness Roumasset, upon cross-examination, testified that she had several times heard Henry Hoover discuss with his daughter the matter of a trust and that he had also discussed the trust with her; that she had heard him discuss the trust with his attorney Mr. Rea; that "Mr. Hoover often discussed with his daughter, when she was demanding that he sign deeds to all his property and turn it over to her, he often told her he thought the only sensible thing to do was to convey all this property in trust for her, that she was absolutely not a fit manager for his business property, or ranch property, that

it would be much more satisfactory if it were in a trust and she would have a regular income, 'regular salary' he always said, coming in each month"; that Gertrude "opposed it very bitterly, she said the property was hers as his only child and she objected to a trust". She further testified when the so-called trust codicil was executed that "He was very clear, perfectly rational and absolutely not under the influence of any opiates"; that "It had been in his possession several days" and that she read it over to him several times; that Rea was not present at any of the times she read it to him; that before the trust codicil was actually written "every day for many days, Mr. Hoover had indicated to you (Mr. Rea) . . . that he wished to make another codicil to his will putting everything in trust for his daughter. At that time you had persuaded him to not make up his mind as yet and in a day or two he asked you to go ahead and make that codicil, that he wanted it done, . . . "; that prior to the 8th of October, the date of the execution of the trust codicil, the codicil had been with Mr. Hoover for several days; that Mr. Hoover was the one who insisted the codicil be signed; that she never heard Mr. Rea in any conversation say anything to Mr. Hoover in regard to what he should or should not do; that Mr. Hoover knew in all the transactions what he was doing; that he was "Very positive, very decided in his opinion."

In connection with the testimony of Gertrude Hoover it was shown that while her father was in the hospital she had filed an injunction suit against her father; that upon the hearing of same it was decided in favor of her father; and that she had also filed a petition to be appointed guardian of her father; that no citation was served upon the father in connection with the guardianship matter.

The foregoing is the *résumé* of the substantial testimony. At the close of the evidence introduced by the contestant the proponent to the will and codicils as admitted to probate moved the court for a nonsuit upon the ground of insufficiency of the evidence to prove or tend to prove material allegations of the contest, specifying amongst other things that there was not any evidence that said decedent's mind was afflicted so as to be easily influenced by those in whom he had confidence or otherwise proving or tending to prove

at the time of the execution of any of the documents decedent reposed great or any trust or confidence in Waldo H. Lowe or in E. M. Rea, or that they or either of them controlled or influenced the mind or actions of the decedent whatsoever, or that they suggested or directed him how to make his will, or that they or either of them in any manner substituted their wills for the will of the decedent, or proving or tending to prove that said will and codicils and each thereof were not the free and voluntary act of the decedent, or that any of them were procured or made by the undue influence or any influence of either Lowe or Rea. The motion for nonsuit was granted and from the judgment entered dismissing the contest this appeal is before us.

(1) Respondent contends that appellant is not entitled to maintain this appeal for the reason that she first filed a contest to this codicil before its probate, which contest was upon identically the same grounds as the contest after probate involved in this appeal and in support thereof calls attention to section 380 of the Probate Code which provides: "When a will has been admitted to probate, any interested person, *other than a party to a contest before probate* . . . may . . . after such probate, contest the same or the validity of the will." Respondent relies upon *Estate of Smith*, 214 Cal. 50 [3 Pac. (2d) 921], and particularly upon the language used by the District Court of Appeal, 64 Cal. App. Dec. 56, at page 61 [295 Pac. 75], as follows, after referring to section 1327 of the Code of Civil Procedure (now sec. 380 of the Probate Code): "The contestants above mentioned would seem to be expressly excepted by. such section from the right to contest after probate, particularly in view of the fact that their contest before probate of the same will on the same grounds was determined adversely to them."

Without question where the contest before probate has been "determined adversely" it is the intent of section 380 of the Probate Code to prevent another contest after probate. However, where, like in the case at bar, the contest before probate has been dismissed by the contestant before any trial of the issues of the contest as provided by section 371 of the Probate Code, it does not preclude a contest after probate under the aforementioned section 380 of the Probate Code.

Section 370 of the Probate Code provides for the contest before probate and section 371 provides how the issues of such contest shall be tried. When the contest is dismissed before trial of the issues there ceases to be a contest; in other words, there has not been a determination of the issues. ■ A contest implies a trial and final judgment. The mere institution of a contest and dismissal without a trial is not a contest. (*Wait* v. *Westfall,* 161 Ind. 648 [68 N. E. 271] ; *McCahan's Estate,* 221 Pa. 186 [70 Atl. 711].) The provisions of section 380 of the Probate Code, are intended merely as a prohibition against two successive trials of the same issues.

■ (2) Appellant in her opening brief states "that our entire attack herein is directed at the trust codicil of October 8, 1931, which cuts down the disposition to Gertrude to the net income of his property during her life with remainder to 'my heirs then living' at her death", and contends that the motion for a nonsuit was erroneously granted by the trial court because "the evidence adduced by the contestant showed the presence of the *indicia* of undue influence so ably summed up in the opinion of" the Supreme Court in *Estate of Yale,* 214 Cal. 115, at page 122 [4 Pac. (2d) 153].

The *indicia* set forth in the *Estate of Yale, supra,* are (a) the provisions of the will were unnatural; it cut off from any substantial bequest the natural objects of the decedent's bounty. (b) The dispositions of the will were at variance with the intentions of the decedent expressed both before and after its execution. (c) The relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act. (d) The decedent's mental and physical condition was such as to permit a subversion of his freedom of will. (e) The chief beneficiaries under the will were active in procuring the instrument to be executed and in addition a confidential relationship existed between at least one of the chief beneficiaries and the decedent.

(a) The facts in the case at bar do not show that the only child, the daughter Gertrude, was cut off from any substantial bequest. On the other hand, the trust codicil attacked gives the entire net income of the residue of his estate to her for her life.

(b) The dispositions of the trust codicil, like the will in the Yale case, were at variance with the will of the decedent expressed over many years of his life.

(c) The chief beneficiaries, other than appellant, were not in such a relation to the decedent to afford them any opportunity to control the testamentary act. Appellant claims, however, that the relations between the decedent and the Bank of America, particularly his relations with Mr. Lowe of that bank as well as the relations between the decedent and his attorney E. M. Rea, afforded an opportunity to control the testamentary act. There is a marked difference between being afforded an opportunity to control a testamentary act and actually exercising any control whatsoever. As far as the record in this case goes there is not any evidence whatsoever that either Mr. Lowe or Mr. Rea in any manner whatsoever influenced or dictated to the decedent what provisions should be written into the so-called trust codicil. It is true the record shows that Mr. Rea was the attorney who drew the will but the record is entirely absent of any activity on his part of the slightest attempt to influence the mind of the decedent.

(d) The decedent's mental and physical condition was such as to permit a subversion of his freedom of will. It is true that the testator was physically diseased by a mortal illness. There is not any evidence of any mental weakness, except at times when he was under the effects of opiates. The evidence shows that at the execution of the codicil he was entirely free from any effects of the opiates.

Item (e) in the Yale matter is entirely lacking as neither Lowe nor Rea were beneficiaries under the will and further, neither were active in procuring the instrument to be executed. The fact that the will provides that Rea shall be the attorney in the matter of the probate thereof does not make him a beneficiary. It has been held that an executor is not a beneficiary (*Estate of Haupt,* 200 Cal. 147 [252 Pac. 597]), and that an executor is not bound to employ the counsel named by the testator. (*Estate of Ogier,* 101 Cal. 381 [35 Pac. 900, 40 Am. St. Rep. 61]; *Highfield* v. *Bozio,* 188 Cal. 727 [207 Pac. 242].)

As to the last item, appellant urges that "There was a trust relation between the decedent, the Bank's employee Lowe, and the attorney Rea." Assuming that such trust

relation did exist as between the decedent and each of the persons mentioned there is not a scintilla of evidence that shows that either of said persons violated their respective trusts in the slightest.

From the record in this case we are satisfied that the motion for nonsuit was properly granted.

Judgment affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 17, 1934, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 13, 1924.

Curtis, J., and Preston, J., voted for a hearing.