SWYGART ET AL. v. WILLARD ET AL.

166    25
f170   212
170    213

[No. 20,473. Filed January 25, 1906.]

1. EVIDENCE.—*Wills.*—*Insanity.*—*Drink.*—*Increase of Habit.*—It is not error, in the trial of an action to contest a will, to refuse to strike out an answer that testator "drank a great deal more than he did in prior years, and he used more profanity and was more indecent," such witness having testified to knowledge of testator's habits for ten years. p. 28.

2. SAME.—*"Indecent."*—*Explanation of Meaning of.*—It is competent for a witness to explain the meaning of "indecent" as used by him in characterizing a testator. p. 29.

3. SAME. — *Wills.* — *Insanity.* — *"Profanity."* — *"Indecency."* — *"Ungovernable Temper."*—*"Strong Language."*—*"Rational."*— It is not error to permit witnesses, in the trial of an action to contest a will, to use the words "profanity," "indecency," "ungovernable temper," "strong language," "rational," and the like in characterizing the acts and conduct of the testator, where opportunity is given on cross-examination to bring out the details. p. 29.

4. SAME.—*Wills.*—*Insanity.*—*Opinions.*—It is competent, in the trial of an action to contest a will, to ask a lay witness "From what you have stated, from what you have seen of [testator], * * * tell the jury what you think as to his being of sound or unsound mind during those ten years you knew him." p. 30.

5. SAME.—*Opinions.*—*Question for Jury.*—*Insanity.*—If a lay witness testifies to any material facts tending to show such knowledge and intimacy with a testator as to enable him to form an opinion of the testator's mental condition, he is competent to express an opinion upon such facts, the weight thereof being for the jury. p. 30.

6. TRIAL.—*Instructions.*—*Wills.*—*Insanity.*—*Opinions.*—*Jury.*—It is proper, in an action to contest a will, to instruct the jury that lay witnesses could give opinions as to testator's sanity only upon facts detailed by them to the jury, and that the jury were not bound by such opinions but might examine the facts stated and reach their own conclusion. p. 31.

7. SAME.—*Evidence.*—*Objections.*—*Time for Making.*—An objection made to a question after the answer has been given by the witness is too late. p. 31.

8. EVIDENCE.—*Physicians.*—*Opinions.*—*Explanations of Medical Terms.*—*Symptoms of Insanity.*—*Forms of.*—*Alcohol.*—It is competent for a physician, in the trial of an action to contest a will, to explain the meaning of "mania," "monomania" and other

technical terms; to explain the symptoms of a mind suffering from insane delusions and the symptoms of dementia; to give an opinion as to the class of mental unsoundness upon a hypothetical state of facts and to explain the effect on the brain and mind of the excessive use of alcohol.    p. 32.

9.    EVIDENCE.—*Opinions.*—*Forms of Insanity.*—*Cross-Examination.*—*Discretion of Court.*—Permitting defendants' lay witness, in an action to contest a will, to testify, over objection, on cross-examination, that a testator might be of sound mind on some subjects and unsound on others is not an abuse of discretion, where such witness testified to knowledge of testator and his conduct for many years.    p. 32.

10.    SAME. — *Impeaching.*—*Contradictory Statements.*—*Wills.*— *Insanity.*—Where a defendant, in an action to contest a will, testified to testator's sanity and denied making contradictory statements, it was competent to prove in rebuttal that he did make such contradictory statements.    p. 33.

11.    SAME. — *Impeaching.* — *Wills.* — *Insanity.* — *Drunkenness.* — Where defendants' witness testified to his taking a trip with testator to Philadelphia and that he never saw testator intoxicated, it was competent in rebuttal to show that testator was drunk on such trip with witness, the habit of the testator with reference to the use of intoxicating liquors, and the resultant effect upon his mind being material.    p. 33.

12.    SAME.—*Impeaching.*—*Wills.*—*Testator's Relation to Legatee.* —Where a defendant legatee testified that his relations with the testator, his father, were always pleasant, he could be contradicted by a plaintiff or any other witness by showing specific acts of trouble between them.    p. 33.

13.    SAME.—*Impeachment.*—*Collateral Matter.*—*Wills.*—*Insanity.* —Evidence of defendant son's pleasant relations with his father, the testator, being admissible only on the question of testator's sanity, impeaching evidence of unpleasant relations is not on a collateral issue, and is admissible.    p. 34.

14.    SAME.—*Impeachment.*—*Contradictory Statements.*—*Wills.*— *Alterations.*—Where defendants' witness, in an action to contest a will—one ground being subsequent, material alterations— testified to his reading the will at the funeral, it was competent to impeach him by showing his statement that he had read the wrong will at the funeral.    p. 34.

15.    APPEAL AND ERROR. — *Evidence.* — *Wrongful Admission.* — *Favorable Verdict.*—*Harmless Error.*—Appellants cannot complain of the wrongful admission of evidence on an issue, where such issue is found in their favor.    p. 34.

16.    SAME. — *Writings.* — *Authentication.*—*Court Records.*—Affidavits of a party, used in another suit and on file in the clerk's

office, when identified by a witness as in the handwriting of such party, are admissible in evidence, and the clerk's testimony that they are a part of the files of the case is unnecessary. p. 34.

17. TRIAL. — *Instructions.—Wills.—Insanity.—Post-Testamentary Declarations.—How Considered.*—An instruction that post-testamentary declaraticns of a testator, that he had given property of a certain value to a child, can be considered only on the question of soundness of mind and not as evidence of the fact of such gift, is proper. p. 34.

18. APPEAL AND ERROR. — *Trial. — Instructions. — Favorable. — Harmless Error.*—Appellants cannot complain of the court's giving a favorable instruction at their request. p. 35.

19. TRIAL.—*Instructions.—Wills.—Testamentary Capacity.*—An instruction that testator had testamentary capacity if he had "the capacity of mind to know what he was doing and the effect of what he was doing" is not objectionable. p. 35.

20. SAME. — *Instructions.—Wills.—Testamentary Capacity.*—An instruction that, to make a valid will, testator was required to possess mind and memory enough to know and grasp at the one time while making his will the extent and value of his property, the number and names of those who were the natural objects of his bounty, their deserts with reference to their conduct towards him, their capacity and necessity, and to retain these facts until the will was executed, is correct. p. 35.

21. SAME. — *Instructions. — Wills. — Insanity. — Drunkenness. — Invasion of Province of Jury.*—An instruction, that if a testator was sober and in the possession of his mental faculties when he executed the will in question, the fact of his being drunk at other times would not of itself invalidate such will, is not an invasion of the province of the jury. p. 36.

22. SAME. — *Instructions.—Wills.—Insanity.—Drunkenness.*—An instruction, that if drunkenness were so long continued by the testator as to produce unsoundness of mind, the same rules as to testamentary capacity would apply as in case of mental unsoundness from other causes, is correct. p. 36.

23. SAME. — *Instructions. — Wills.—Insanity.—Monomania.*—An instruction that if testator was suffering from monomania which prompted his action and affected his purpose and object in making his will, such will is invalid, is correct. p. 36.

24. WILLS.—*Testamentary Capacity.—Evidence.—Question for Jury.*—Where the evidence showed that testator, at the time of the execution of his will, was 77 years old; that he married and reared a family of nine children, was divorced, remarried and again divorced because of his cruelty; that he drank to great excess many years; that he was very profane, uncouth

and used vile, indecent and obscene language anywhere; that his memory was bad and he was filthy in his personal deportment; that he very frequently ordered work done and shortly afterwards denied his order and that his treatment of his children was irrational, the question of his sanity was for the jury, whose verdict cannot be disturbed on the weight of the evidence. p. 37.

From Porter Circuit Court; *Willis C. McMahan,* Judge.

Action by Ella Willard and others against John Swygart and others. From a judgment for plaintiffs, defendants appeal. *Affirmed.*

*Meyer & Drummond* and *N. L. Agnew,* for appellants.
*Brick & Bates, Conley & Frank, E. D. Crumpacker, D. E. Kelley* and *McInerney & Wurzer,* for appellees.

MONTGOMERY, J.—This action was brought by appellees in the circuit court of St. Joseph county, to contest the will of George W. Swygart, deceased, for the reasons that (1) the testator was of unsound mind, (2) the will was unduly executed, (3) the execution of the will was procured through undue influence, and (4) because of material alterations in the will since the death of the decedent. The venue of the cause was changed to Laporte county, and thence to Porter county, where a trial by jury resulted in a verdict and judgment in favor of appellees. Appellants filed joint and several motions for a new trial, alleging 173 grounds or reasons therefor, which motions were overruled, and exceptions duly saved.

The ruling of the court in denying appellants a new trial is the only alleged error assigned.

The second alleged cause for a new trial was based upon a motion to strike out the answer to the following question propounded by appellees to their witness on direct examination: "How was he in his latter years, about his drink, Mr. Gise, how much did he drink, and what was its effect upon him, as you noticed him? A. Well, he drank a great deal more than he did in prior years.

and he used more profanity and was more indecent." The witness had previously testified to an acquaintance with the testator for ten years, and to his habit of using intoxicating liquors, and as to other habits. If such habits had grown and become more pronounced within the knowledge of the witness it was proper for him so to state. Gillett, Indirect and Collat. Ev., §213.

This court in the case of *Louisville, etc., R. Co.* v. *Wood* (1888), 113 Ind. 544, 553, pertinent to this point said: "In determining whether an injured person is growing better or worse, a non-expert witness must necessarily express an opinion, for, as the cases we have cited hold, the fact is one that can not be described by any other than an expert witness. Any witness of ordinary intelligence may be able to state that a sick or wounded person has grown worse or has improved without being able to give an acurate description of his condition, and this brings the case fully within the authorities. Undoubtedly, the facts on which the conclusion rests may be asked for on cross-examination, but the opinion is not incompetent merely because the witness can not adequately state the grounds on which it rests, although the failure to do so may, perhaps, weaken its probative force."

In response to the next question the witness, over appellants' objection, explained his meaning in the use
2. of the word "indecent." There was no error in overruling appellants' motion to reject this answer. Specifications 3, 4, 5, 6, 7, 8, 11, 13, 14, 18, 19, 20, 22, 25, 26, 32, 42, 49, 52, 54 and 60, are of the same general character, and the rulings therein complained of
3. were correct. It is further made manifest that no prejudicial error could have resulted from these rulings, since the court at the time stated that, in permitting such expressions as "profanity," "indecency," "ungovernable temper," "strong language," "rational," and the like, to stand, counsel on either side would be given ample

latitude on cross-examination to bring out full details. *Bower* v. *Bower* (1895), 142 Ind. 194, 200; *Johnson* v. *Thompson* (1880), 72 Ind. 167, 171, 37 Am. Rep. 152.

(9) Appellees asked their witness the following question: "Well, now, from what you have stated, from what you have seen of George W. Swygart, will you tell the jury what you think as to his being of sound or unsound mind during those ten years you knew him." Appellants objected on the ground that the opinion sought was not limited to the facts and appearances detailed to the jury. The question is unskilfully framed, but we think was intended to elicit the opinion of the witness upon the facts gathered from his acquaintance with and observation of the deceased for ten years, and detailed to the jury in his previous testimony, and that the rule invoked by appellants was not violated. Specification forty-six is very similar, but the question was in better form and the objection untenable. *Kenworthy* v. *Williams* (1854), 5 Ind. 375; *Rush* v. *Magee* (1871), 36 Ind. 69; *State, ex rel.,* v. *Newlin* (1879), 69 Ind. 108; *Stumph* v. *Miller* (1895), 142 Ind. 442.

(10) Appellees propounded to their witness John Finch a question calling for his opinion as to the sanity of the testator, to which appellants objected, for the reason that no facts had been stated by him which tended to prove that the testator was of unsound mind at the time of making the will and codicil. This witness had testified to an acquaintance with the testator for twenty-five years, to his appearance, walk, manner of conversation, habits, disposition and memory. The witness was clearly competent to express an opinion upon these facts as to the mental condition of the deceased. The weight of such opinion depended upon the primary facts given, and was exclusively for the jury. If any material facts are stated at all by the witness tending to show such knowledge and intimacy with the testator as to enable him

to form an opinion of the testator's mental condition, it is the duty of the trial court to permit such opinion to be expressed, and to go to the jury for whatever it may be worth. *Colee* v. *State* (1881), 75 Ind. 511; *Goodwin* v. *State* (1884), 96 Ind. 550; *Carthage Turnpike Co.* v. *Andrews* (1885), 102 Ind. 138, 143, 52 Am. Rep. 653; *Johnson* v. *Culver* (1888), 116 Ind. 278; *Bower* v. *Bower, supra; Blume* v. *State* (1900), 154 Ind. 343.

A contrary rule, requiring the trial court at his peril instantly to determine the effect of such evidence, would subject the court to constant danger of invading the province of the jury and result in many harmful **6.** errors; while the holding now approved can rarely, if ever, operate to the prejudice of the rights of either party. The court in this case by instruction twenty-nine specifically advised the jury that non-expert witnesses could only give opinions upon facts detailed by them to the jury; and that the jury were not bound by such opinion, but were at liberty to examine the facts stated, and if no facts tending to support the opinion had been given by a witness, such opinion might be wholly disregarded. Appellants' objection to this question was properly overruled. Specifications 16, 23, 33, 34, 47 and 48 were based on similar objections, and in all these instances the objections were untenable, and the rulings manifestly harmless.

(70 and 71) In response to a question whether mania, previously mentioned as one of the classifications of insanity, was what is popularly regarded as "craziness," Dr. Long answered: "I believe that is the **7.** idea." Appellants' objection to the question and motion to strike out the answer were overruled. The objection was made after the answer had been given, and was too late to be availing. Ewbank, Indiana Trial Ev., §258.

The ruling in refusing to strike out the answer was certainly harmless. The inquiry was merely preliminary.

In introducing the witness, and preparatory to the presentation of the point directly involved, it is always proper, if not positively necessary, to ask some questions of a general character. It is eminently proper also that a witness dealing with scientific or technical terms should, if possible, make his meaning more clear by reference to terms in common use. (72) It was not improper, for the same reasons, to permit this witness to explain the meaning of "monomania" as used by him. (73 and 74) The doctor was rightfully permitted to explain the distinctive peculiarities of a mind suffering from insane delusions; (75 and 76) the symptoms of dementia; and (79 and 85) upon a hypothetical statement of facts, showing some form of mental unsoundness, he was permitted to testify under what class of unsoundness of mind the testator should be placed. (82) A medical expert may also explain the effect resulting to the brain, nervous system and body of a man from the excessive use of alcohol. 2 Elliott, Evidence, §1089.

(90) Judge Walter A. Funk, appellants' witness, was asked upon cross-examination the following question: "You know it to be a fact, don't you Judge, from your studies, that a person may be of unsound mind upon some particular subject or class of subjects, and yet be of sound mind upon other subjects or classes of subjects—you know that to be a fact, don't you Judge?" Appellants objected, on the ground that the inquiry went beyond the realm of cross-examination of a non-expert witness. The objection was overruled; and the witness answered: "Yes, I have been informed of that being a fact." This witness had testified to an acquaintance with the decedent, to business transactions, conversations, his appearance and other incidental matters, and expressed an opinion that the testator was of sound mind. The extent to which cross-examination may go is left largely to the discretion of the trial court, and this court will only

interfere where an abuse of such discretion is shown. The statement of the witness was in accord with other testimony in the case and was in nowise contradicted, and we can not perceive how appellants' interests were injured by the answer of this witness.

(102 and 106) Appellant John Swygart testified to facts tending to prove his father's testamentary capacity, and upon cross-examination was asked whether he had not made particular statements out of court of a contradictory character, which he denied. In rebuttal, appellees were permitted to prove that such statements in substance were made by the witness at the time and place fixed. This evidence was admitted by the court solely on the ground of impeachment, and, the foundation therefor having been properly laid, it was competent for that purpose. *Staser* v. *Hogan* (1889), 120 Ind. 207, 218.

(108 to 111) Jerry Berger, appellants' witness, testified that he had taken a trip to Philadelphia with the testator, that he had never seen him in a state of intoxication, and that he was of sound mind. Appellees, in rebuttal, were allowed to prove that the testator was drunk in company with Berger on the Philadelphia trip. The habit of the testator with respect to the use of intoxicating liquors, and its resultant effects upon his mind, were involved, and this evidence was material and rightly admitted. Gillett, Indirect and Collat. Ev., §61; 30 Am. and Eng. Ency. Law (2d ed.), 1063.

(124) Appellant John Swygart testified that the relations between himself and his father had always been pleasant, and there had been no difficulty between them at any time. George Swygart was permitted in rebuttal to give particular instances of trouble between John and his father. It is insisted that George Swygart being a party to the issue was incompetent to testify upon this subject. We can not agree with this contention. John Swygart was competent to testify to his

transactions with his father, to his general disposition and the relations existing between them as tending to show mental sanity. He did so testify, and it was entirely proper to contradict him as to material facts covered by his testimony, and any witness cognizant of such facts, whether a party or not, was competent for that purpose. It must be held upon the same principle that the foundation was properly laid, and the impeachment not upon a collateral matter as urged in specifications 138, 141, 145, 146, 147 and 148.

(126, 127, 128 and 132) The evidence received in rebuttal to the effect that Mr. Dunbar had said that he read the wrong will at the funeral was competent under the issues, as the fourth alleged ground of contest had not been dismissed or abandoned. The court instructed the jury in appellant's favor as to this allegation of the complaint, so that they no longer have any reason to complain of the admission of this evidence.

(149 to 155) Appellees introduced F. E. Wurzer as a witness to identify certain affidavits made by Edward Swygart in the suit for divorce between his father and mother. Appellants objected on the ground that he was not a competent witness to identify papers which were part of the files of the office of the clerk of the circuit court of St. Joseph county. This objection was not well taken; the witness was competent for the purpose, and when sufficiently identified by such witness the affidavits were admissible. *McFadden* v. *Ferris* (1893), 6 Ind. App. 454, 457.

(158) The court instructed the jury that statements made by the testator in the absence of a child, to the effect that he had given property of a certain value to such child, were not to be considered as evidence of that fact; but such statements were competent and to be considered upon the issue of unsoundness of mind. The

statements shown by the evidence and to which this instruction was addressed were not made by the decedent as a part of the transaction to which they related, but at various subsequent dates. Such statements were accordingly only competent upon the issue of unsoundness of mind, and the instruction correctly advised the jury of the proper application of this evidence. *Thistlewaite* v. *Thistlewaite* (1892), 132 Ind. 355; *Harness·* v. *Harness* (1875), 49 Ind. 384.

(159) The next instruction complained of was given at the request of appellants, except so much of it as defines "monomania." The modification made by the court was proper in itself and pertinent. The instruction as given was favorable to appellants, and affords no just cause for complaint.

(160) In defining the degree of mental capacity requisite to the making of a valid will, the court instructed the jury that they might find the testator competent, if they found among other things "that he had the capacity of mind to know what he was doing and the effect o'f what he was doing." Objection is made to the latter part of this quotation. We find no substantial objection to this language. The jury were thereby merely advised that the testator should know what he was doing, and also the purport, tenor and legal effect of such testamentary act. The use of the word "effect" in this connection did not in our opinion add a new element to the well-established definition of testamentary capacity.

(161) Appellants complain because the court instructed the jury that the testator was required "to possess mind and memory enough to know and grasp at the one time while making his will the extent and value of his property," etc. There is no material departure in this language from that used in many instructions heretofore approved by this court. *Wait* v. *Westfall* (1904), 161 Ind. 648, 662; *Teegarden* v. *Lewis* (1896),

145 Ind. 98, 101; *Burkhart* v. *Gladish* (1890), 123 Ind. 337; *Cline* v. *Lindsey* (1887), 110 Ind. 337.

(163) The jury were instructed that if a testator was sober and in possession of all his mental faculties at the time of making his will, the fact that he was drunk at other times would not of itself be sufficient evidence to invalidate the will. It is argued that the court invaded the province of the jury by the assumption in this instruction that drunkenness was some evidence of insanity. There was much evidence introduced in this case of the excessive use of intoxicating liquors by the testator. It was admitted without objection, and rightly so, as tending to show mental incapacity to make the will in suit. The next instruction advised the jury that if drunkenness were so long continued as to produce unsoundness of mind, the same rules as to testamentary capacity would apply as in cases of mental unsoundness from other causes. These two instructions correctly stated and applied the law to the evidence upon the subject of the testator's drunkenness; and the instruction complained of did not invade the province of the jury. *Wagner* v. *State* (1888), 116 Ind. 181, 186; *Goodwin* v. *State* (1884), 96 Ind. 550, 580.

(164) The fourteenth instruction given by the court reads as follows: "A man may have sufficient mind to know and comprehend that he is making a will and thereby disposing of his property, giving it to some of the natural objects of his bounty to the exclusion of others, and have an object in so doing which he fully comprehends, and yet be prompted so to dispose of his property by some form of monomania. And if the monomania affected in any way or entered into the making of the will, such will would be invalid and should be set aside." This instruction is criticised by counsel as inconsistent and contradictory in its terms. We can not concur in the view of counsel in this regard. The instruction cor-

rectly advises the jury that if the testator is suffering from monomania which prompts his action and affects his purpose and object in making a will, such will would be invalid.    This instruction was tactily admitted to be correct in the case of *Young* v. *Miller* (1896), 145 Ind. 652, 655.

(156-157)   It is finally insisted that the verdict is not sustained by sufficient evidence, and is contrary to law.

Appellees evidence proved or tended to prove the following facts:   George W. Swygart was born in Pennsylvania about the year 1823.   His parents were poor, and his early advantages in life limited.   He married on reaching manhood, and a few years later moved to Cleveland, Ohio, where he resided for three or four years, and moved thence to South Bend, Indiana.   He was a brick mason and maker of bricks by trade, and did some contracting and building, employing at times quite a number of men.   He was always frugal and saving, almost miserly, and industrious and hardworking until after he became more than sixty years of age.   He earned and saved about $7,000, which between the years 1857 and 1864 he invested in farm lands and other real estate adjacent to the city of South Bend.   He retained this property, and by the growth and expansion of the city his farm lands became in large part city property.   At the time of his death that part of the lands so bought and still held and owned by him was of the value of about $140,000.   A part of the land so bought was platted and sold by him, and the proceeds reinvested in business property in the cities of South Bend, and Elkhart, Indiana, in Topeka, Kansas, and in Los Angeles, California, and in farm lands in Michigan; his entire worth at the time of his death being about $200,000. He and his wife resided together until about the year 1876, and nine children were born of the union, one of whom died at Cleveland.   Serious domestic troubles then arose, resulting in a separation, and his wife obtained a decree of divorce and the custody of the children, together with a

judgment for $7,500 alimony. Within three or four years he remarried, and lived with his second wife eight or ten years. No children were born of this marriage. Domestic troubles again arose, and the second wife was divorced, with $10,000 alimony. After the second divorce he lived with his tenants on the farm or in the city of South Bend until about the year 1892, when he moved into a house in South Bend and secured the services of Eva Swygart, a granddaughter of his brother, who continued to keep house and care for him until the time of his death. After divorcement, his first wife removed to Illinois with the children, and thereafter none of the children ever lived with him, except that in 1892 John and his wife moved into the house, and remained a few months, and then becoming dissatisfied left and removed again from the State. His children visited him at intervals, and upon such visits he would sometimes receive them with cordiality, and other times coolly, and frequently would appear unfriendly and hostile, without any apparent or known reason for his changeable moods. He was a man of quick temper, which he made no effort to control; gruff and plain spoken in his intercourse with men, and had little regard for the conventionalities of life. His energies were devoted toward the accumulation and saving of money, until he was about sixty-five years old, and he took no part in social functions. He was exacting in his relations with men in his employ, and in all kinds of business matters, and would drive the closest bargain it was possible to secure.

Before being divorced from his first wife he acquired the habit of using intoxicating liquors, and occasionally drank to excess. This habit grew, and during the last ten years of his life there was scarcely a day that he was not more or less under the influence of liquor, and he often became helpless from intoxication. During the last five years of his life he kept whiskey at his bedside and whenever awake during the night would drink, and usually drank the

first thing upon arising in the morning. He drank an average of a pint of whiskey daily at his home, besides a considerable quantity at saloons and drug stores, and was under the influence of intoxicants both day and night. He was often in a maudlin condition from drink for five or six days of the week.

During the last ten years of his life he became quite feeble; he used a cane, tottered, and shuffled his feet in walking. He was irritable and would fly into a rage over the most trivial things. He was very profane and would use shockingly indecent and obscene language at any place and in any presence. His memory became poor and his conversations incoherent; and he would frequently go about muttering to himself about his money and his children, and thereby often become greatly excited and enraged. He had no pride in his personal appearance, and would go about the house and upon the street with his face, shirtfront and clothes besmeared with tobacco juice. He rarely took a bath, and would not wash his face unless urged to do so by his housekeeper. He would chew a quid of tobacco awhile, then take it out of his mouth and put it in his vest pocket to be chewed again. He would spit tobacco juice over the floor, carpets and on his bed. During the last five years of his life he had little regard for cleanliness or decency, and when able to go to the closet or out of doors he would frequently urinate in his bed, on the rugs, carpets and floor of the sitting room and parlor, and would frequently go past the water-closet in the house to urinate in the kitchen sink, and his conversations were generally characterized by incoherency and contradictory statements.

In 1893 or 1894 he employed a deputy sheriff to sell some personal property, which he had taken on a chattel mortgage. He went with the officer whom he knew well, attended the sale, and directed the officer to apply to him the following morning for the costs. The next morning he declared he did not know the officer, had never seen him

before, that he had had no property sold, and refused to pay the costs. In 1897 or 1898 he ordered a deed made in the forenoon which he intended as a gift to one of his children, and in the afternoon of the same day he denied having ordered the deed, declared the child unworthy, and said that he had never contemplated giving the child any property.

In 1898 he ordered a man to make some repairs on four or five buildings and directed him to shingle a particular house first. The scaffolding was built and the roof taken off the house, when he ordered this man to stop and go and paint a tin roof on another house. Before the painting was half done he ordered the man to stop and go and repair a cistern, and when he had procured the materials and half finished the cistern he was ordered elsewhere, leaving the four jobs unfinished, without any occasion for so doing. He ordered a plumber to do some repairing, and then stopped him before the work was completed, denying that he had given the order. He ordered a tenant to change a partition fence, then stopped the work, denying that he had ordered such change. He ordered insurance on buildings already fully insured. He rented a farm for one year by written lease, which but a few days before he had leased in writing for the same time and upon the same terms to another man. He ordered work done for him at a hardware store, and when done and ready for delivery he denied the order, and refused to accept or pay for the work. He contracted 500 bushels of corn to a dealer and delivered 56 bushels, and then never delivered any more, called for his pay, or spoke of what had been delivered. In 1898 he requested a neighbor to procure a tenant for one of his farms, and a few days afterwards declared he had never mentioned the subject and could attend to his own business. In 1900 he requested a dealer with whom he was acquainted to buy some firewood and sent him to the farm to inspect it, but two hours later denied that he had ever talked

of selling the wood, and stated that he had no wood for sale. During the last three years of his life he declared and believed he owned 700 acres of land in West Virginia and a large tract in North Carolina, when in fact he never at any time owned any land in either of those states. He frequently went to tenants, whose terms had not expired, and without cause ordered them to vacate at once, and attempted to rent to strangers houses already occupied. He declared and believed his son William, who died ten years before his father, was very wealthy, when, in fact, he died poor, and was buried at the expense of relatives.

In 1896, while going home intoxicated, he fell upon an iron fence and hurt his head severely. When taken into the house by a neighbor he declared that this neighbor who assisted him, and with whom he was well acquainted and on friendly terms, had knocked him down with the intention of robbing him. In 1892 he was induced by a stranger to buy a "gold brick," of a man disguised as an Indian, for $7,500; and on discovering the fraud, at once and frequently afterwards, declared and seemed to believe that his son Edward was a party to the scheme. He also declared and seemed to believe that his son John and other members of the family had entered into a conspiracy to defraud him, and had prompted the "gold brick" swindle, all without any evidence to justify such suspicion.

During the last ten years of his life the burden of his conversation was his money, his property and his children, and the manner in which he would dispose of his property. His children were all men and women of respectable standing, and treated him as kindly and affectionately as he would permit them to do. He lamented the fact that none of the family lived with him. He talked occasionally of his first wife—sometimes saying she was a good woman and helped to earn his property, and again that she was a spendthrift, recklessly extravagant and a strumpet, when in truth she was a good woman and of frugal habits. In

speaking of his children he would sometimes say they were all good children, and he intended to treat them alike in his will; at other times he would denounce some of his daughters as extravagant spendthrifts and unworthy, and declared that he would give them nothing. In speaking of his children he would often become greatly excited, and sometimes abuse his daughters using vile and base names and epithets, and probably the following day would say they were dutiful and worthy women, and declare that his sons were thieves and rascals and should receive no part of his estate. His daughter Lillie, thirty-eight years of age, had been an invalid from childhood. He generally said she was unfortunate and unable to provide for herself, and that he would make abundant provision for her, and give her more than any other one of his children; but sometimes he would curse and abuse her. She lived at Elkhart the last three years of his life, and at one time he sent for her to come to South Bend to visit him. She came, and on arrival informed him that she only had enough money to pay her fare coming and would have to get from him the money for her return fare, about fifty cents, whereupon he flew into a rage, cursed and abused her, and drove her from his house; and she went penniless to a neighbor who sent her home on the following day. He afterwards frequently said he thought more of her than any other child.

During the last ten years of his life he was very suspicious of every one, and especially of his children. He imagined they wanted to rob him, and had no affection or respect for him, but cared only for his property. He often declared his children had no claims upon him, and that he would give his property to some public institution, or to found a hospital or orphan's asylum; and at other times, that if he could convert his property into money he would burn it. He talked frequently about wills, and said that he had made various dispositions of his property. He

made at least sixteen wills within the last fifteen years of his life.

In 1899 he deeded to his son John a house and lot in South Bend of the value of $15,000, and about the same time deeded to a trustee property in South Bend and Elkhart of the value of $15,000, with directions that the net income of the property should be paid to his daughter Lillie during life, and at her death the property was to go to his sons John and Edward and to his daughter Eva, if they should survive her. At the same time he deeded to a trustee a like amount of property in South Bend and Elkhart, the income of which was to go to his daughter Eva during her life, and if she died childless the property should at her death go to John, Edward and Lillie, if they survived her, but if she left children the property should go to them. These were the only provisions ever made for his daughters Lillie and Eva.

On July 13, 1900, he made the will in suit, by the provisions of which he gave his eldest daughter Clementina, who was the mother of one child and in poor circumstances and had never received anything from him, $5,000, and no more. He gave his daughter Ella, who was the mother of five small children, and a widow wholly without means, the rent and income from two houses in South Bend of the value of $9,000, during life, and at her death the property to go to John and Edward. He gave to his housekeeper a house and lot of the value of $4,500. He gave to a grandnephew, residing in Pennsylvania, whom he had seen but once, $5,000; and all his other property of the value of $140,000, he gave equally to his sons John and Edward, both of whom were in good circumstances. On September 28, 1901, he made a codicil revoking some minor legacies not above mentioned. On September 14, 1901, he was stricken with paralysis, and six months afterwards he suffered a second stroke from which he died about one week later, on March 29, 1902.

There were many worthy and creditable witnesses who testified to facts tending to show that the testator was of sound mind. It was the province of the jury to reconcile the apparent conflict in the evidence, if possible, and determine all questions of fact. We are required to decide whether upon the most favorable view of the evidence the conclusion was warranted. The jury might have found the above summary of evidence introduced by appellees to be true; and upon such facts their verdict holding the will invalid was fully justified.

There was manifest impairment of the testator's mind and the presence of delusions. His mental infirmity was almost invariably disclosed when he talked about his children, his property, and the disposition of his estate after death. The unnatural provisions of his will may reasonably be attributed to his deranged and failing intellect, and otherwise can not be fairly explained. The verdict of the jury can not be disturbed on the weight of the evidence.

All other alleged errors embraced in appellants' motion for a new trial have been waived. There was no error in overruling the motion for a new trial, and the judgment is affirmed.

Gillett, C. J., did not participate in this decision.