## McReynolds et al. v. Smith et al.

[No. 21,131.    Filed January 26, 1909.    Rehearing denied May 25, 1909.]

1.  TRIAL.— Verdict.— Interrogatories.— Wills.— Testamentary Capacity.—In a proceeding to probate a will, answers to interrogatories to the jury showing that the testator did not have mind and memory sufficient to know the contents of his will, the ordinary business affairs of life, the extent and value of his estate, or his wife and children, nor have the ability to keep such matters in mind long enough to execute a will, do not entitle the proponents of the will to a judgment.    p. 338.

2.  TRIAL.—Burden of Proof.—Wills.—Resisting Probate.—In a proceeding to probate a will, the burden of proving the due execution of the will and the testamentary capacity of the testator rests upon the proponents.    p. 339.

3.  APPEAL.—Evidence.—Sufficiency.—In determining the sufficiency of the evidence to sustain a verdict only that favorable to the prevailing party will be considered.    p. 339.

4.  EVIDENCE.— Insanity.— Wills.— Testamentary Capacity.— Evidence of delusions, religious monomania, belief in spurious values, revelations, and of other actions and conduct, is admissible as tending to show the unsoundness of the testator's mind.    p. 340.

5.  WILLS.—Testamentary Capacity.—Monomania.—Monomania of the testator, where it affects the testator in the execution of his will, renders the will invalid.    p. 344.

6.  APPEAL.—Weighing Evidence.—Wills.—Where the evidence as to testator's testamentary capacity is in conflict, the Supreme Court will not disturb the judgment below.    p. 344.

7.  TRIAL.—Instructions.—Wills.—Testamentary Capacity.—An instruction, in a proceeding to probate a will, that while the law does not undertake to measure the mind and memory requisite for the execution of a will, "yet it does require" a testator to possess mind and memory sufficient to know the extent and value of his property, the number and names of those who are the natural objects of his bounty, their deserts with reference to their treatment of him, their needs, and that he shall have power to hold these in mind long enough to execute his will, and that if he has not mental power to this extent, he is of unsound mind within the meaning of the law, is correct.    Barricklow v. Stewart, 163 Ind. 438, explained.    p. 345.

8.  TRIAL.—Instructions.—Wills.—Partial Insanity.—An instruction that if a testator executed his will under the influence of partial insanity, it should be held invalid, is not erroneous.    p. 347.

9. TRIAL.— *Instructions.*— *Wills.*— *Delusions.*—An instruction that an insane delusion exists when a person imagines that certain fancies exist in fact, which fancies cannot be removed by reason and argument, and that a will which is the offspring of such delusion is invalid; and so if the jury find that the testator was the owner of a stone-quarry, that he had "wild and exaggerated notions of the value and qualities" thereof, that such notions were foundationless, and could not be removed by argument and that they affected the execution of the will, it should be set aside, is correct. p. 347.

10. TRIAL.— *Instructions.*— *Wills.*—*Insanity.*— *Opinions.*— An instruction that the jury, in estimating the value of the opinions of witnesses as to the testator's sanity, should consider the facts testified to as the basis of their opinions, and from such facts, aided by the witnesses' opinions, the evidence should be tested, is not objectionable. p. 348.

11. EVIDENCE.— *Opinions.*— *Insanity.*— *Wills.*— Opinion evidence based upon facts detailed by the witness, showing testator's intense religious faith. his conduct and persistency, is not harmful to plaintiffs, in a proceeding to probate a will. p. 349.

12. EVIDENCE.—*Hypothetical Questions.*—*Facts.*—Where there is some evidence tending to prove as true the facts assumed in a hypothetical question propounded to an expert witness, his opinion thereon is admissible. p. 350.

From Howard Circuit Court; *J. F. Elliott,* Judge.

Suit by Alzora N. Smith and others against William H. McReynolds and others. From a judgment for plaintiffs, defendants appeal. *Affirmed.*

*Stanley W. Menell* and *Kirkpatrick & Morrison,* for appellants.

*Bell & Purdum, John E. Moore* and *Blacklidge, Wolf & Barnes,* for appellees.

HADLEY, J.—Appellees, being daughters of George W. Defenbaugh, brought this suit to prevent the probate of what purported to be the will, and codicil thereto, of their father. The defendants Elizabeth Defenbaugh and Wilbur M. Defenbaugh are the widow and minor son of the testator. The defendants McReynolds, Richmond, the General Convention of the New Church in the United States, and S. S. Seward,

president of said last-named defendant, are trustees and beneficiaries under said will. The complaint alleges unsoundness of mind and undue influence. It is alleged that the decedent was of unsound mind on the subject of the Swedenborgian religion, and that, when he executed said pretended will, he was guided therein by what he imagined to be a peculiar revelation, and that said will was the direct result of a delusion and imaginary revelation, and undue influence. The widow and minor son made default. The widow renounced the will, and elected to take her rights under the law. Richmond died. McReynolds, the General Convention of the New Church in the United States, and S. S. Seward each filed a separate answer of general denial. The jury returned a general verdict for the plaintiffs, together with answers to interrogatories submitted by the court. The answering defendants moved for judgment in their favor on the answers to interrogatories. The motion was overruled. The answers to the interrogatories, that related to the decedent's testamentary capacity at the time the pretended will was executed, disclose the following facts: The testator, at the time said purported will was written by McReynolds and examined and criticised by one Pollard, and also when he signed said will and said codicil, to wit, May 12, 1891, and January 5, 1901, did not have mind and memory sufficient to know and understand the contents thereof; and he did not, when the will and the codicil were executed, have mind and memory sufficient to understand the ordinary business affairs of life, nor have a general knowledge of the value and extent of his estate; and he did not, when he executed the will, have mind and memory sufficient to know and understand the business in which he was engaged, the extent of his estate, and the persons who were his wife and children, nor could he keep these things in his mind long enough to have his will prepared and executed. In the light of these facts it is so plain that the court rightly overruled appellants' motion for judgment

that we deem it presumptuous to cite authorities in support of the ruling.

The motion of appellants for a new trial was overruled. As the reason for a new trial it is insisted that the verdict is not sustained by sufficient evidence. The case of

2. *Wait* v. *Westfall* (1904), 161 Ind. 648, is not an authority in this case relating to the burden of proof. In the former case, before the will was attacked, the probate court, upon competent and satisfactory proof, had admitted the same to probate; that is, it had adjudged the will valid, which included a finding that the testator was of sound mind, and the instrument duly executed. Such case was an action to set aside the judgment of probate, because erroneous, and the party assailing the validity of the judgment clearly had the burden of proving what she asserted. The reverse is true in this case. The appellants tendered the probate court a pretended will that gave them valuable rights in derogation of the statutes of descent. Those legally entitled under the statute met appellants at the threshold, and challenged the validity of the instrument before any judicial action had been taken upon it. In such a case it is alike clear that a traverse of such instrument by those prejudiced thereby would impose upon the proponents the burden of maintaining its integrity. *Steinkuehler* v. *Wempner* (1907), 169 Ind. 154, 15 L. R. A. (N. S.) 673, and cases cited. In determining the sufficiency of the evidence

3. it is only necessary that we review the evidence produced that tends to support the verdict. Contrary evidence may as well be disregarded, since, where legal evidence appears on both sides, and in conflict, we have no authority to disturb the decision of the jury upon its weight and importance. *Robinson & Co.* v. *Hathaway* (1898), 150 Ind. 679; *Oglebay* v. *Tippecanoe Loan, etc., Co.* (1908), 41 Ind. App. 481.

There was much direct and positive evidence submitted to the jury in support of the following facts: George W.

Defenbaugh was born in 1839, married at the age of twenty-two, and had been a resident of Kokomo for about forty years. He was always highly respected for his virtues, and for his moral, upright life. At the time of his marriage both he and his wife were active members of the Methodist Episcopal Church, but twenty or twenty-five years before his death, which occurred in 1906, he was attracted to the religious doctrines taught by Emanuel Swedenborg. He soon became deeply interested in the new doctrine, and so enthusiastic and earnest in its dissemination that he devoted much of his time and means to its advocacy and in the distribution of tracts and other writings of Swedenborg. His zeal continued to intensify, until Swedenborgian dogmas so completely dominated his mind and thoughts as to intrude themselves into all his business and social relations. There was much unanimity among the witnesses that for eighteen or twenty years before his death it had seemed impossible for him to engage in conversation on any subject without an intermingling of the tenets and teaching of Swedenborg, and that many business transactions with him had failed on account of his persistence in the presentation of his belief. A number of witnesses estimated that four-fifths of all his conversations, including business contracts, were so occupied. He would accost persons in the street, strangers as well as acquaintances, young and old, and those of high and lowly station, and as long as he could get a hearing, would urge upon them the acceptance of his views. He would also call upon his own skilled employes—those receiving $2.50 per day—in working hours, and request them to suspend their work and give him a hearing, and thus detain them from their work two or three hours at a time. The same course of conduct was pursued in the stores and business offices of the city. So, in his own home, with the younger members of his family, whom, when they sought to avoid him, he would follow about the house, upstairs and downstairs, and into the yard, with his entreaties, and

give them sums of money to read certain tracts and books. It was the same way with the family visitors; and when expostulated with by his wife for becoming tiresome to their guests, he would express, and seem to feel, regret, but in a few moments would lapse into the same deportment, his fervent insistence on all occasions being that the "Word" (meaning the Bible) was spiritually revealed to man by Swedenborg's writings, and could not be understood in any other way than by and through such writings; and that all who did not read the same, and thus enter into the spiritual meaning of the Bible, were ignorant of its truths. He often spoke about the teachings of Swedenborg's being the key that would alone unlock the Bible. He claimed that he could, and did, communicate with the departed; also that he had power to visit the planets, and did visit them, and had acquaintances on Mars, Jupiter, and Saturn. He said he often went to Mars, and would give a particular description of its inhabitants, and its canals and mountains. He claimed that it had been revealed to him that Saturn was to be his future home, and he would run a stone-quarry there. He said he had been all through heaven and hell, and knew what was going on in the respective places. He asserted that he had visions and revelations. He abandoned the putting down of a gas-well on his property, because, in a vision, he was informed there was no gas under the land. He was the owner and operator of a stone-quarry adjacent to the city of Kokomo, worth about $12,000. He believed that its value was very much greater, and often asserted its value to be one, or more, million dollars, and that it might be operated at a profit of $100 per day. He made and delivered to his son a statement of the possibilities of the quarry, as follows: "The different kinds of things that can be made from the stone-quarry: (1) Building stone and range stone. (2) Dimension stone of several kinds. (3) Artificial stone from ground stone, several kinds. (4) Crushed stone of several kinds. (5) Stone screenings of

several kinds. (6) Glass fluxing for many factories. (7) Iron fluxing of higher grade for Chicago and many other towns at a high price. (8) Lime for fluxing and many other purposes. (9) Four feet of rock said by geologists to be cement rock. (10) Stone to make mineral wool and several other materials not mentioned. (11) Aluminum in eight feet of stone as according to the Illinois Steel Company's analysis equal to five per cent, making 100 pounds of ore to every ton of stone or 17,408 tons to every acre of my land at $35 per ton, making a total of $609,280 per acre, providing it can be gotten out of the stone according to this estimate. Estimated to be 100,000 perch of good stone to the acre, which ought to bring net when sold at fifty cents a perch, equal to $50,000 per acre. (12) The last and best of all, ten feet of the Magnesia stone, and by using about twenty-five per cent to the ton, making it thirty cents per pound, about $150 per ton, or as estimated to be worth two or three million dollars to each acre of land.'' He became careless in his business, neglected necessary repairs to his machinery, and lost important contracts for stone because of persistence in putting aside his business terms for his ceaseless exhortation. He made no material addition to his estate in recent years. The increase in value that has occurred resulted from holding on to what he had until the discovery of natural gas, and the consequent growth in population and prices. Under the will the ultimate destination of all his estate, real and personal, upon the failure of grandchildren, was in his church. His estate, at his death, was worth about $35,000. The will and codicil occupy twenty-one printed pages of the record in making and safeguarding bequests to five beneficiaries, namely, his widow, three children, and his church. It is prolix, indefinite, and often obscure. One of his children, a young woman, at home when the will was executed, is not mentioned in the instrument. To his only son he devised, in fee, land of the value of $500, and the stone-quarry for the life of himself and his children,

if any should be born, with remainder in fee to his church, upon condition that, during the continuance of the life estate, the son should make annual reports to the church trustees of the receipts and expenditures incident to operating the quarry, and pay over to them one-tenth of the net receipts for support of the church. To his daughters was given no immediate estate, except that his widow should provide them with $1,000 each, in money or property, within six months after their marriage, and they were also given an equal interest with their brother in the possible remainder of certain other property, after the extinguishment of their mother's life estate therein. To his first wife, who was living when the will was made, and who was the mother of all his children, and a loving and helpful companion for more than thirty years, he gave in fee the homestead, of the value of $5,000, and for life all the remainder of his property, real and personal, "except all such as I herein otherwise give, devise and bequeath and direct to and for the use of such purposes, persons, trustees and societies hereinafter named and specified," and upon failure of grandchildren all the remainder to go to said trustees for the endowment of the church. His first wife died in 1895, and he remarried in 1898, whereupon, in 1901, he executed the codicil to his will, now in suit, conferring upon the second wife, who had lived with him but three years, all the rights, benefits, and powers he had conferred upon his first wife by his former will. As one witness put it, he desired that the name of his first wife be stricken out of the will wherever it occurred, and the name of his second wife inserted. When a kinsman suggested to the testator that he thought it was unjust to his son to be given only a life estate in the stone-quarry, and that, too, burdened with the duty of reporting to, and paying a tenth of the income as tribute to, the church, and that he (witness) thought it would be discouraging to the young man in the business of operating the quarry, and be less profitable to both, and that he thought it would be better to divide the

property, and give to his son outright, and in fee, the share he wished him to have, and the remainder to the church, the testator replied that he had had a revelation in which he was directed to make the will in that way, and he was fixed in his purpose. To his son he said that he could not change the will; that it was a sacred document, and he might not receive another revelation.

The foregoing evidence was competent as addressed to the question of the testator's mental capacity, and at least tends to prove that the testator had an insane delusion that he was in direct and active communication with the spirit world; that he had actual communication with spirits; had personally visited the planets, formed an acquaintance with their inhabitants, and had had it revealed to him that he should, after death, go to the planet Saturn and conduct a stone-quarry, and furthermore, that he had been instructed from the spirit world, by revelation, how he should make his will, and that it was a sacred document he could not change without forfeiting the benefits of revelation. These things not only tend to establish the existence of an insane delusion, but also show that the will in question was, at least in some measure, the result of such delusion. It is the law of this State that one possessed of a monomania or insane delusion, although rational and discreet in all other things, will be held to be of unsound mind, and incapable of making a will, if it appears that the monomania or delusion entered into or affected the execution of the will. *Wait* v. *Westfall* (1904), 161 Ind. 648; *Swygart* v. *Willard* (1906), 166 Ind. 25-36. On the question of general unsoundness, it is argued that the voluminous, confused and uncertain provisions of the will are, of themselves, evidence that the testator did not have mind enough to know and understand what was in it. And, further, that his frequent and fervent exhortations in the stores and business offices of his city, his inattention to his own private affairs, his neglect to make necessary repairs to the machinery

used in operating the stone-quarry, and his apparent unconsciousness in giving offense to, and in driving away, customers, by forcing his religious doctrines into his business dealings, constituted evidence to warrant the jury in finding that he did not have mind enough to understand the business affairs of life, and to act with discretion therein. It is also claimed that his failure to mention in the will the name of one of his daughters, his fanciful and unreasonable estimate of the value of his stone-quarry, the daily profit of its operation, and the small bequests to his daughters, go strongly to impeach his knowledge of the value and extent of his estate and his recollection of those who were the natural objects of his bounty, their deserts, and his duty toward them. *Teegarden* v. *Lewis* (1896), 145 Ind. 98; *Young* v. *Miller* (1896), 145 Ind. 652; *Wait* v. *Westfall, supra.* In addition to the foregoing evidence, about forty of the old friends and neighbors, who had resided near and known the testator for many years, expressed their opinion, founded on facts testified to, that when he executed the will and codicil he was of unsound mind. There was competent evidence to the contrary, but the jury, from the whole field of the evidence, found that the testator was wanting in testamentary capacity when he executed the will and codicil in suit, and which finding the presiding judge approved, as indicated by the overruling of appellants' motion for a new trial. This must be the end of it, so far as the sufficiency of the evidence is concerned.

The action of the court, in giving and refusing certain instructions, is next complained of.

The first one criticised is number three, given upon request of appellees, relating to the subject of testamentary capacity.

7. In substance, it was as follows: The law does not undertake to measure a person's intellect and to define the exact quality of mind and memory which he shall possess to authorize him to make a will, yet it does require him to possess mind sufficient to know the extent and value

of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct toward him and treatment of him, their necessity, and that he shall have sufficient active memory to retain all these facts in his mind long enough to have his will prepared and executed. If he is not in the possession of mental faculties to this extent, he is of unsound mind, or insane, within the meaning of the law. This instruction is in harmony with the standard of testamentary capacity as firmly established by many decisions of this court, among which are the following: *Lowder* v. *Lowder* (1877), 58 Ind. 538, 540; *Burkhart* v. *Gladish* (1890), 123 Ind. 337, 342; *Harrison* v. *Bishop* (1892), 131 Ind. 161, 164, 31 Am. St. 422; *Teegarden* v. *Lewis, supra; Bower* v. *Bower* (1896), 146 Ind. 393, 398; *Roller* v. *Kling* (1898), 150 Ind. 159; *Wait* v. *Westfall, supra; Barricklow* v. *Stewart* (1904), 163 Ind. 438; *Swygart* v. *Willard, supra.* The particular objection is lodged against the words "yet it does require him to possess mind sufficient to know," etc. The objection is founded on an expression used in *Barricklow* v. *Stewart, supra,* in these words: "The law does not arbitrarily pronounce a person incompetent to make a will who is unable to know both the extent and value of his property." Standing alone, the sentence quoted is not in line with the uniform decisions of this court, since *Lowder* v. *Lowder, supra,* relating to the degree of mental capacity essential to the making of a valid will. See cases last cited. It is obvious from the context of the opinion that the writer used the words in their restricted sense, by way of illustration, and as applicable only to one who was, from any cause "unable to know the extent," etc.—that is, unable to know for want of opportunity, or means of knowledge—the test, as held by the decisions, and clearly meant by the instruction under consideration, being that the testator, to make a valid will, must have at the time, not necessarily actual knowledge of all the elements embraced within the capacity definition, but suffi-

cient strength and power of mind to grasp, and know in a general way, the different subjects or elements enumerated. That the court and the writer of the opinion in the case of *Barricklow* v. *Stewart, supra,* entertained this view of the law, as the established standard of testamentary capacity is expressly recognized in the opinion.

Objection is made to instruction four of the same series. It informed the jury that to find the testator did not have capacity to make a will, it was not necessary that the evidence should show that he was a maniac, a madman, or a fit subject for the asylum, but a will is invalid if made by one laboring under partial insanity, or unsoundness of mind, if it is sufficient to, and does, affect the disposition of the property; and if the jury believed, from the evidence, that the will in controversy was made under the influence of such partial unsoundness of mind, and is the product of it, it should be held invalid. The complaint made of this instruction is that the court failed to explain to the jury what was meant by partial insanity. The court did say that if the will was made under the influence of such partial insanity, and was a product thereof, it was invalid. The jury might reasonably infer that any degree of unsoundness was meant that was sufficient to induce or influence the making of a will in consonance with the mental disorder. This was right, or at most not erroneous. Besides, appellants could have had a more specific instruction by the asking.

The jury was told in instruction six that an insane delusion exists when a person imagines that certain facts exist which have no existence at all, except in the imagination of such person, and which false impression cannot be removed from such person's mind by any amount of reasoning and argument, and that a will which is the offspring of such delusion is invalid. So, if the jury should find from the evidence that the testator, when he executed the will, was the owner of a certain stone-quarry, and at that time had wild and exaggerated notions of the value

and qualities of said stone-quarry, which notions had no basis whatever in fact, and were such as no rational mind would believe, and such notions or beliefs had found permanent lodgment in his mind, and could not be removed by any amount of reason or argument, and if the jury was convinced by these and other facts that the testator was under a delusion concerning the stone-quarry, and that such delusion controlled, or affected, the execution of his will, the jury should find it invalid. It is urged that this instruction is faulty for resting delusive facts upon "wild and exaggerated notions of the value and qualities of the stone-quarry;" that delusions must relate to facts, and not to opinions. The testimony disclosed that the open market value of the stone-quarry (containing about thirty acres) was $12,000; that the testator asserted its value to be several millions of dollars, and, to justify his opinion, he made out and delivered to his son a statement of twelve distinct elements of value in the stone, a single one of which showed the land to be worth from $2,000,000 to $3,000,000 per acre. It was left to the jury to determine whether the testator had wild and exaggerated notions about the value and qualities of the stone-quarry, and whether such notions amounted to an insane delusion. We cannot see why an insane delusion may not spring from a question of value (call it fact or opinion) as well as from anything else. In any case, the question is one of reason and reasonableness.

Instruction twelve of the same series is also criticised. It reads as follows: "Witnesses have testified before you as to facts concerning the manner, conduct and conversations of the testator, and have, from the facts testified about by them, given to you their opinions as to the soundness or unsoundness of the mind of the testator; but each opinion should be tested by the facts upon which it is based, in order to judge of its probable correctness. It is not the opinion of witnesses alone upon which reliance is

to be placed; but, from the premises which supplied the conviction in the minds of the several witnesses, the jury, aided by these opinions, may form its own independent conviction and decide accordingly.'' The chief complaint is that the instruction is made to àpply to physicians who expressed opinions from hypothetical questions only, and who gave no facts as the basis of the opinion expressed. We do not think the instruction is open to any such objection. The instruction is expressly approved in *Bower* v. *Bower* (1895), 142 Ind. 194, 199, and we perceive no fault in it.

Objection is made to divers other instructions given, and to the refusal to give others, that we will not specially notice, but we have carefully examined all, and find that no error has been committed by the court in reference thereto. Indeed, taking the instructions given as a whole, they were full and quite favorable to the appellants.

It is also claimed that the court erred in permitting a non-expert witness to answer on reëxamination the following question: ''Having this degree of faith, and the conduct and persistency about him that you observed in Mr. Defenbaugh, and as you have detailed to the jury, was it, in your opinion, evidence of unsound mind?'' We see nothing prejudicial in the question. The witness had previously detailed the conduct of the testator as observed by him—his great energy and persistence in pushing forward his religious doctrines and literature; his careless conduct in the business of the stone-quarry; his alleged visits to Mars; the healing virtues of the sun, etc.—and had in his direct examination, without objection, upon the facts detailed by him, expressed an adverse opinion of the testator's sanity. Under the state of the witness's testimony, we think it would not have been error to exclude the question and answer, but we cannot see how the appellants were injured by their admission.

Finally, error is also assigned on the overruling of appel-

lants' objection to the hypothetical question propounded by appellees to certain physicians offered by them as experts. If we understand appellants' objection to the question, it is because the question assumes the existence of facts which the evidence does not tend to prove. No effort has been made to point out such facts, either in argument or in stating objections at the time of the ruling, and a careful examination of the question discloses no fact unsupported by the evidence. There are many other objections relating to the evidence set out, but not mentioned in the argument. They are, however, all of minor importance, and were disposed of without prejudicial error to appellants, and we see no good to be accomplished by their separate review.

Judgment affirmed.

Monks, J., did not participate.